MKB:EAL
F. #2006R00745

**M-07 736**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------x

UNITED STATES OF AMERICA

    -against-

KWOK KEUNG WONG,
    also known as "Bill Wong,"
YIM CHI WONG,
    also known as "Jean Wong,"
SCHLOMO GREENBERG,
JOHN SCIARA,
RONALD DEPAOLA,
    also known as "Ronald DePaula"
    and "Ronald DePaolo,"
JOSEPH DEPAOLA,
    also known as "Joseph DePaula"
    and "Joseph DePaolo,"
CHRISTINE DEJOHN,
ROBERT ROSSOMANGO,
YAKOUB SAADIA,
    also known as "Joe,"
    "Joe Qureshi," "Jack Saadia"
    and "Joe Weber,"
HENRY MANDIL,
RAMNARINE TIWARI,
    also known as "Chris,"
PHILLIP MCENTEE,
JOSEPH VENETUCCI,
JUDY FRISCO,
JAMES BALL,
JOHN HSU,
FARAJ SADAKA,
    also known as "Freddy," and
MONIQUE ROLON,
    also known as "Monique Communale,"

                Defendants.

-------------------------------------------X

SEALED AFFIDAVIT
AND COMPLAINT IN
SUPPORT OF APPLICATION
FOR ARREST WARRANTS
AND SEARCH WARRANTS
(18 U.S.C. § 371, 1956
 (a)(2)(A), and 2)

2

```
----------------------------------------X
```

UNITED STATES OF AMERICA

    -against-

THE PREMISES KNOWN AND
DESCRIBED AS 230-59
INTERNATIONAL AIRPORT CENTER,
NORTH LOWER SUITE 190, AIR TRANS
LOGISTICS,SPRINGFIELD GARDENS, NEW YORK
("SUBJECT PREMISES 1")

```
----------------------------------------X
```

UNITED STATES OF AMERICA

    -against-

THE PREMISES KNOWN AND
DESCRIBED AS 230-59
INTERNATIONAL AIRPORT CENTER,
FIRST FLOOR, OFFICE OCCUPIED BY
RONALD AND JOSEPH DEPAOLA,
SPRINGFIELD GARDENS, NEW YORK
("SUBJECT PREMISES 2")

```
----------------------------------------X
```

EASTERN DISTRICT OF NEW YORK:

      ROBERT WILLIAMS, being duly sworn, deposes and says

that he is a Special Agent with the United States Immigration and

Customs Enforcement, El Dorado Group 6, duly appointed according

to law and acting as such.

      Upon information and belief, in or about and between

June 2005 and February 2007, both dates being approximate and

inclusive, within the Eastern District of New York and elsewhere,

the defendants KWOK KEUNG WONG, also known as "Bill Wong," YIM

CHI WONG, also known as "Jean Wong," SCHLOMO GREENBERG, JOHN

SCIARA, RONALD DEPAOLA, also known as "Ronald DePaula" and
"Ronald DePaolo," JOSEPH DEPAOLA, also known as "Joseph DePaula"
and "Joseph DePaolo," CHRISTINE DEJOHN and ROBERT ROSSOMANGO,
together with others, did knowingly and intentionally conspire to
import and bring into the United States merchandise contrary to
law, and receive, conceal, and facilitate the transportation,
concealment and sale of merchandise after importation knowing
such merchandise to have been imported and brought into the
United States contrary to law, in violation of Title 18, United
States Code, Section 545.

(Title 18, United States Code, Section 371)

Upon information and belief, in or about and between
March 2006 and the present, both dates being approximate and
inclusive, within the Eastern District of New York and elsewhere,
the defendants KWOK KEUNG WONG, also known as "Bill Wong," YIM
CHI WONG, also known as "Jean Wong," YAKOUB SAADIA, also known as
"Joe," "Joe Qureshi" and "Jack Saadia," HENRY MANDIL, RAMNARINE
TIWARI, also known as "Chris," PHILLIP MCENTEE, JOSEPH VENETUCCI,
JUDY FRISCO, JAMES BALL, JOHN HSU, FARAJ SADAKA, also known as
"Freddy," and MONIQUE ROLON, also known as "Monique Communale,"
together with others, did knowingly and intentionally conspire to
import and bring into the United States merchandise contrary to
law, and receive, conceal, and facilitate the transportation,
concealment and sale of merchandise after importation knowing

4

such merchandise to have been imported and brought into the United States contrary to law, in violation of Title 18, United States Code, Section 545.

(Title 18, United States Code, Section 371)

Upon information and belief, in or about and between January 2005 and April 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants KWOK KEUNG WONG, also known as "Bill Wong," and YIM CHI WONG, also known as "Jean Wong," together with others, did knowingly and intentionally transport, transmit, and transfer a monetary instrument and funds from a place in the United States to a place outside the United States with the intent to promote the carrying on of specified unlawful activity, to wit, trafficking in counterfeit goods.

(Title 18, United States Code, Section 1956(a)(2)(A), and 2)

Upon information and belief, in or about and between June 2006 and October 2006, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant YAKOUB SAADIA, also known as "Joe," "Joe Qureshi" and "Jack Saadia," together with others, did knowingly and intentionally transport, transmit, and transfer a monetary instrument and funds from a place in the United States to a place outside the United States with the intent to promote the carrying

on of specified unlawful activity, to wit, trafficking in counterfeit goods.

(Title 18, United States Code, Section 1956(a)(2)(A))

Upon information and belief, there is probable cause to believe that there is located at THE PREMISES KNOWN AND DESCRIBED AS 230-59 INTERNATIONAL AIRPORT CENTER, NORTH LOWER SUITE 190, AIR TRANS LOGISTICS, SPRINGFIELD GARDENS, NEW YORK ("SUBJECT PREMISES 1") financial and other business records, including receipts, invoices, ledgers, written correspondence, supplier lists, customer lists, and shipping records, all of which constitute evidence, fruits and instrumentalities of a conspiracy to import and bring into the United States merchandise contrary to law, and receive, conceal, and facilitate the transportation, concealment and sale of merchandise after importation knowing such merchandise to have been imported and brought into the United States contrary to law, in violation of Title 18, United States Code, Section 545.

Upon information and belief, there is probable cause to believe that there is located at THE PREMISES KNOWN AND DESCRIBED AS 230-59 INTERNATIONAL AIRPORT CENTER, FIRST FLOOR, OFFICE OCCUPIED BY RONALD AND JOSEPH DEPAOLA, SPRINGFIELD GARDENS, NEW YORK ("SUBJECT PREMISES 2"), financial and other business records, including receipts, invoices, ledgers, written correspondence, supplier lists, customer lists, and shipping

6

records, all of which constitute evidence, fruits and instrumentalities of a conspiracy to import and bring into the United States merchandise contrary to law, and receive, conceal, and facilitate the transportation, concealment and sale of merchandise after importation knowing such merchandise to have been imported and brought into the United States contrary to law, in violation of Title 18, United States Code, Section 545.

The source of your deponent's information and the grounds for his belief are as follows:

1.   I have been a Special Agent with the United States Immigration and Customs Enforcement ("ICE") for approximately ten years.  I am currently assigned to the Intellectual Property Rights Smuggling Group, which is responsible for investigating crimes such as commercial fraud, smuggling, and trafficking in counterfeit goods.  During that time period, I have participated in numerous investigations of the foregoing crimes.

2.   This affidavit is based upon my own observations, as well as the following additional sources: (a) surveillance undertaken by me and other agents and investigators; (b) conversations with cooperating witnesses, and reports of other agents and investigators who have had such conversations; and (c) conversations with members of the El Dorado Task Force and officers of the New York City Police Department ("NYPD") and

other law enforcement agencies.  Because this affidavit is being
submitted for the limited purpose of establishing probable cause
to arrest, it does not include all of the facts that I have
learned during the course of this investigation.  Where the
contents of documents and the actions, statements and
conversations of others are reported herein, they are reported in
substance and in part, except where otherwise indicated.

          3.   As discussed more fully below, an investigation by
ICE has revealed that several individuals in the Eastern District
of New York and elsewhere have, among other things, smuggled
counterfeit goods and other merchandise into the United States
and have trafficked in such goods.[1]

## I.   Background

A.  The Importation of Goods into the United States

          4.   Containers of goods arriving at the ports of the
United States must be granted "entry," or clearance, by the
Department of Homeland Security, Customs and Border Protection
(hereinafter "Customs" or "CBP"), prior to the goods being
allowed to enter the commerce of the United States.  The importer
of a container of goods must obtain such clearance through the
use of a "Customs Broker."  A Customs Broker is an individual or
company licensed by Customs to file entry documents for

---

[1]Customs and ICE officials have provided samples of the
counterfeit goods to investigators of the actual trademarked
companies, who have confirmed that the goods were counterfeit.

8

commercial shipments. The importer (or agent of the importer) presents the Customs Broker with certain documents describing the containers, including, but not limited to, bills of lading, invoices, and packing lists; the Customs Broker provides to Customs information from those documents in order to obtain Customs' clearance allowing the goods to enter the United States. Statutes and regulations governing the importation process, including but not limited to Title 18, United States Code Sections 541 and 542, and Title 19, United States Code Sections 1431, 1433, and 1592, require that the information provided to Customs about a particular container be truthful and complete. Based on the information provided on the shipping documents and application for entry, Customs may clear a particular container or shipment without inspecting it. Indeed, the large volume of cargo arriving at the ports each day prohibits Customs from examining every container or shipment prior to Customs release. Customs will target certain containers and air shipments for review and, on some occasions, will randomly examine air shipments. If and when Customs clears a container, Customs informs the Customs Broker who, in turn, informs the importer that the container has been cleared. After a container is cleared, it may be removed from the port and delivered to the importer or their customer.

5.    If a shipment arrives at the port prior to its being granted "entry," it may be temporarily stored at a Customs-bonded[2] facility (also known as a "container freight station"). Before the shipment can be taken from the port to a Customs-bonded facility, however, the importer must obtain a "Permit to Transfer" ("PTT") from Customs.  PTTs allow shipments to be moved from the port of entry on the condition that they be moved to a Customs-bonded facility until they are formally allowed to enter into the commerce of the United States.  After Customs grants the PTT, the importer may arrange for the shipment to be picked up from the port by a Customs-bonded truck and taken to a Customs-bonded facility where it is stored until Customs grants an official "entry" of the shipment.  The shipment may not be moved from the Customs-bonded facility until Customs clears the shipment.  If Customs decides to examine a shipment which arrived via a seaport, the shipment must be moved from the Customs-bonded facility to a Customs Exam Site ("CES"), where it will be

---

[2]Customs allows certain facilities and transportation companies to move and store freight prior to it being formally entered into the commerce of the United States.  These entities are required to maintain a "Customs bond," usually through an insurance company.  The entities are also informed of Customs rules and regulations, including certain security measures set forth by Customs, are required to abide by those rules.  Additionally, the Customs-bonded entities are required to submit a list of employees to Customs, and Customs conducts a background check of those employees.

examined.[3/]   If Customs seeks to examine a shipment imported

through John F. Kennedy ("JFK") airport, it does so at the

Customs-bonded container freight station to which the shipment

was moved.

## II.   The Defendants

6.    The defendant KWOK KEUNG WONG, also known as "Bill

Wong," operates a freight forwarding company called Air Trans

Logistics (USA) Inc.," ("ATL"), out of the KDL Container Freight

Station ("KDL"), located at 230-59 International Airport Center

Boulevard in Springfield Gardens, New York.[4/]   KDL is a Customs-

bonded facility, authorized to store shipments of goods before

they are granted entry by Customs.   In corporate bank records for

ATL, WONG is listed as the "President" of ATL.

7.    The defendant YIM CHI WONG, also known as "Jean

Wong," assists her husband KWOK KEUNG WONG in operating the

freight forwarding company ATL.   In corporate bank records for

ATL, she is listed as the "Vice President" of ATL.

---

[3/]A Customs Exam Site is a Customs-bonded facility where Customs
conducts commercial and enforcement examinations of containers.
The same general rules apply to this warehouse as any other
Customs-bonded facility except that Customs normally maintains an
office within the facility.

[4/]A freight forwarding company acts as an intermediary between
shippers and consignees of cargo (the person to whom the freight
is destined for delivery).   Their activities include but are not
limited to filing applications with Customs for movement of
shipments from the ports and arranging for transportation of the
shipments.

8.    The defendant SCHLOMO GREENBERG operates a freight forwarding company known as "Payson International," (hereinafter "Payson"), which, according to a cooperating witness and confirmed by corporate bank records and Lexis/Nexis searches, is also known as "Yes Global Express" (hereinafter "Yes"), and "Haizhou (USA) International Logistics" (hereinafter "Haizhou").

9.    The defendant JOHN SCIARA is the licensed broker of the customs brokerage "John Sciara CHB," located at 10 Merrick Road, Suite 210, in Valley Stream, New York.

10.    The defendants RONALD and JOSEPH DEPAOLA, brothers, operate a trucking company known as "Jetex," also known as "Swingline," which operates out of the KDL Container Freight Station, located at 230-59 International Airport Center Boulevard in Springfield Gardens, New York.

11.    The defendant CHRISTINE DEJOHN is a manager at the defendant GREENBERG's company, Payson.

12.    The defendant ROBERT ROSSOMANGO is the warehouse manager of a Customs-bonded facility known as J & J Air Freight, Inc., located at 150-18 132nd Avenue in Jamaica, New York.

13.    The defendant YAKOUB SAADIA, also known as "Joe," "Joe Qureshi," "Jack Saadia" and "Joe Weber," is an importer and operates several businesses at 1407 Broadway, New York, New York, under a number of company names including, but not limited to, "USA Design," "Crest Jeans," "Crest Home Designs," "United

12

Textiles," "Joseph Saloot Logistics" and "Infinity Progress
Marketing."

14.   The defendant HENRY MANDIL is the licensed customs
broker of the customs house brokerage HJM International, located
at 153-39 Rockaway Boulevard, Jamaica, New York.

15.   The defendant RAMNARINE TIWARI, also known as
"Chris," is a former employee of the customs house brokerage HJM
International.

16.   The defendant PHILLIP MCENTEE is the owner of
Metrobox Container Freight Station, located at 123 Pennsylvania
Avenue, Kearney, New Jersey.

17.   The defendant JOSEPH VENETUCCI is the owner of
Gateway Terminal Services, a container freight station located at
100 Newfield Avenue, Edison, New Jersey.

18.   The defendant JUDY FRISCO is a former Container
Exams Site Manager at the Railhead Customs Exam Site.

19.   The defendant JAMES BALL is a former Operations
Manager at the Railhead Customs Exam Site.

20.   The defendant JOHN HSU is the manager of J & J
International Transport located at 901 W. Hillcrest Boulevard in
Inglewood, California ("J & J LA").

21.   The defendant FARAJ SADAKA, also known as
"Freddy," is employed by the defendant YAKOUB SAADIA.

13

22.    The defendant MONIQUE ROLON, also known as "Monique Communale," is the owner of "M. Rolon, Limited," a "logistics" and trucking company, located at 192 Highlawn Avenue in Brooklyn, New York.

### III. The Current Investigation

#### A.    The Schemes

23.    The investigation has revealed that several of the defendants conspired to unlawfully import containers of goods from China into the United States using several schemes.  As part of the schemes, the defendants presented, and caused to be presented, false information to Customs concerning the containers and movement of the containers.  As a further part of the schemes, the defendants caused several containers to be moved from the port or Customs-bonded facility prior to Customs granting clearance of the shipments.

24.    In some cases, the defendants and others filed false paperwork to obtain PTTs from Customs.  The documents supporting the PTTs listed the goods in the containers as items such as children's toys or picture frames or items with a low duty, when in reality, the containers contained counterfeit goods or items with a higher duty than invoiced.  On some occasions, the documents supporting the PTTs listed the goods in the containers as "shoes" or "clothing," when the containers in fact contain counterfeit shoes and clothing.

25.   In addition to falsely describing the goods in the containers, the supporting documents also often contained false information as to the importers.  Specifically, the co-conspirators used the names and federal identification numbers of legitimate, unknowing importers, or listed shell companies as the importers of the goods.  After the PTTs were obtained, the defendants and others moved their shipments from the ports directly to their customers or to their own warehouse where the customers collected the goods.  The defendants failed to deliver the containers to a Customs-bonded facility as they were required to do.

26.   On other occasions, PTTs were not used, and the defendants and others simply filed for entry using the names and federal identification numbers of legitimate, unknowing importers or shell companies.  To disguise the destination of the containers, the shipping documents fraudulently listed the addresses of the importers whose identities were stolen.  After entry was obtained, the defendants and others moved their shipments from the ports directly to their customers or to their own warehouse where the customers collected the goods.

27.   When containers were smuggled using each of the schemes described above, the defendants and others presented "replacement or dummy" freight to Customs officials when Customs asked to examine the container listed on the PTT or entry

15

documents. The containers, which were not shown to Customs when requested, contained counterfeit goods and/or had been moved from the port or Customs-bonded facility prior to Customs granting entry. Often, the "dummy" freights were containers of children's toys (or whatever was fraudulently listed on the documents supporting the entry or PTT) that were stored at the defendant's warehouse for the purpose of deceiving Customs when they asked to inspect the containers that were being smuggled into the United States.

28. On some occasions, the defendants and others used a "diversion scheme" to smuggle the containers into the United States. The defendants would file an application with Customs for a "transport and export" bond, also known as a "T & E bond." The T & E bond would authorize the containers to enter the United States for the sole purpose of crossing the United States on the way to Canada. The T & E bond would also require that the goods be transported in Customs-bonded vehicles and, if necessary, temporarily stored at Customs-bonded facilities. The paperwork filed by the defendants and others would indicate that the containers would arrive into various seaports, including, but not limited to Port Newark, the New York Container Terminal in Staten Island, New York, and Port of Long Beach in California, and be escorted using Customs-bonded vehicles and facilities through the United States all the way to the containers' actual destination

in Canada.   The containers involved in the instant scheme,

however, were not escorted through the United States to Canada.

Instead, the defendants and others arranged for the containers to

be delivered from the ports to the defendants or their customers.

          29.   The investigation began on or about March 28,

2006, when agents at Immigration and Customs Enforcement ("ICE")

were advised by Customs and Border Protection ("CBP") that a PTT

was filed to move a container suspected of containing counterfeit

goods to the KDL Container Freight Station ("KDL"), a Customs-

bonded facility, which, as reflected above, is located at 230-59

International Airport Center Boulevard in Springfield Gardens,

New York.  Agents subsequently learned through a cooperating

witness ("CW1") that employees of KDL and others were involved in

a scheme utilizing PTTs in order to avoid duties and to smuggle

shipments of counterfeit goods into the United States.[5]   Agents

learned that members of the conspiracy provided other members

with shipping documents (bills of lading, invoices, packing lists

and arrival notices) so that a PTT could be made for Customs.

The shipping documents contained fraudulent information about the

contents, value, and consignee of the containers.  With the PTT

on file, the shipments were supposed to be transferred to KDL, a

---

[5]   Information provided by CW1 has proven to be reliable and
has been corroborated by independent sources, including, but not
limited to, agent surveillance.  CW1 has pleaded guilty to a
federal crime and is cooperating with law enforcement with the
expectation of receiving a lesser sentence.

Customs-bonded facility.  According to CW1, the shipments were rarely delivered to KDL.  Instead, they were delivered directly to customers.  If Customs targeted a shipment for exam, a "dummy" shipment was trucked over to the designated Customs Exam Site for inspection.

30.  CW1 has provided documents pertaining to shipments that were smuggled into the United States via KDL since June 2005.  Upon review of the documents provided by CW1, ICE agents determined that more than 350 containers of merchandise have been smuggled into the United States utilizing the PTT scheme associated with KDL.  All of the shipments originated in China and were entered into the United States via the fraudulent use of fictitious and/or unwitting importers.  According to CW1, and corroborated by seizures made by ICE, the commodities smuggled into the United States by the defendants and others included counterfeit clothing, counterfeit footwear and counterfeit handbags, as well as apparel that was improperly described in the shipping documents so as to avoid duty.  The defendants involved in the smuggling scheme associated with KDL include KWOK KEUNG WONG, also known as "Bill Wong," YIM CHI WONG, also known as "Jean Wong," SCHLOMO GREENBERG, RONALD DEPAOLA, also known as "Ronald DePaula" and "Ronald DePaolo," JOSEPH DEPAOLA, also known as "Joseph DePaula" and "Joseph DePaolo," CHRISTINE DEJOHN, JOHN SCIARA and ROBERT ROSSOMANGO.

31.   CW1 also provided information that led to the investigation of an organization doing business under the name of "United Textiles."  The investigation revealed that United Textiles was smuggling containers into the United States utilizing schemes similar to those used by KDL.  The defendants involved in the smuggling scheme associated with United Textiles include the defendants KWOK KEUNG WONG, also known as "Bill Wong," YAKOUB SAADIA, also known as "Joe," "Joe Qureshi" and "Jack Saadia," HENRY MANDIL, RAMNARINE TIWARI, also known as "Chris," PHILLIP MCENTEE, JOSEPH VENETUCCI, JUDY FRISCO, JAMES BALL, JOHN HSU, FARAJ SADAKA, also known as "Freddy," and MONIQUE ROLON, also known as "Monique Communale."

32.   The investigation has revealed that, between June 2005 and the present, the defendants smuggled, or attempted to smuggle, over 900 forty-foot containers into the United States using the above-described schemes.  Approximately 100 containers the defendants attempted to smuggle were seized.  The approximate total Manufacturer's Suggested Retail Price ("MSRP") of the goods seized was over $650,000,000.

B.   The Offense Conduct

Summaries of the defendants' involvement in the conspiracies are set forth below.

KWOK KEUNG WONG, also known as "Bill Wong" and YIM CHI WONG, also known as "Jean Wong"

33.    The defendant KWOK KEUNG WONG, also known as "Bill Wong," operates a freight forwarding company called Air Trans Logistics ("ATL"), out of the KDL Container Freight Station, located at 230-59 International Airport Center Boulevard in Springfield Gardens, New York.  According to CW1, and corporate bank records for ATL and KDL, which bank accounts list WONG as a co-signer, WONG pays the rent and utilities for the KDL facility, as well as the salary for the KDL employees, and controls the bank account for KDL.[6]  Additionally, KDL's bank records reveal, and CW1 confirms, that WONG pays the phone service and rent for "First Warehouse" located at 25 Main Street in Belleville, New Jersey, which surveillance has revealed is the destination for many shipments smuggled into the United States using the above-described schemes.  A vehicle parked outside of the facility on or about August 7, 2006, was identified as being registered to WONG.

34.    The defendant YIM CHI WONG, also known as "Jean Wong," assists her husband KWOK KEUNG WONG in operating the freight forwarding company ATL.  In corporate bank records for ATL, she is listed as the "Vice President" of ATL.

---

[6]The address on both the ATL and KDL bank accounts is: 230-59 International Airport Center Boulevard, Springfield Gardens, New York 11413.

35. According to CW1, WONG approached him/her in or about March 2004 and asked CW1 to file PTTs for shipments in a manner that would avoid custom duties. Statements of CW1 and documents recovered from the KDL facility reveal that, between June 2005 and March 2006, over 100 shipments originating with WONG's shell companies "Ocean-Run International Freight Forwarder, Inc.," "Prestige Logistics," and "AP Transport Services, Inc.," were smuggled by WONG using the schemes described above, i.e., by providing fraudulent paperwork to Customs about the contents of the containers and moving the goods prior to Customs' release.

36. In or about October 2004, CW1 discovered that WONG's shipments contained counterfeit goods, when he/she opened a container because of a mix-up in the delivery address. According to CW1, WONG received approximately $25,000 to $30,000 from his customers for each smuggled shipment.

37. During a conversation between the defendants RONALD and JOSEPH DEPAOLA and CW1 at KDL on or about April 20, 2006, which conversation was recorded, co-defendants RONALD and JOSEPH DEPAOLA discussed WONG's involvement with the scheme to fraudulently import containers of counterfeit goods into the United States. In this conversation, the parties discussed certain containers which were slated to go to a "General Order Warehouse," where Customs sends containers when entry is not made

after a certain period of time or a container is not picked up. The parties decided to ask WONG to file entry for the containers on their behalf.   JOSEPH DEPAOLA makes reference to the fraudulent nature of the goods within the containers stating:

> Tomorrow morning the trucks will be over there picking them up for G-O [the General Order Warehouse].  Oh man, I don't even want to think what they would do. Imagine bringing that shit back to the G-O warehouse and popping those? Oh man.   I don't even want to think what they would do.   This would really open this up, right.  I think they would just come down and haul us all in. Everybody, you're coming in for questioning right now.[1]

    38.   As noted above, a warehouse for which WONG pays the rent, First Warehouse, has received shipments smuggled pursuant to the scheme.  For example, on or about August 9, 2006, agents conducted surveillance at First Warehouse and observed container NYKU5580359 in the parking lot in front of the warehouse.   Customs records indicate that the shipment, which was manifested to contain comforters, arrived at the New York Container Terminal in Staten Island, New York, from China on or about July 24, 2006.  Checks also revealed that, on or about July 21, 2006, J & J International Logistics, Inc., 675 Dowd Avenue in Elizabeth, New Jersey, a Customs-bonded container freight station, filed a PTT to move the container to that station.  An email from the defendant YAKOUB SAADIA to a cooperating witness

---

[1]Quotations set forth in this Complaint are based on preliminary draft transcripts, which are subject to revision.

("CW2") reveals that SAADIA assisted WONG in smuggling container NYKU5580359 into the United States.[8]/ The email, dated July 24, 2006, contains the subject line "Update NYKU5580359," and SAADIA states to CW2: "Go ahead and pick up and deliver to First Wehouse [sic]." As of August 9, 2006, the agents observed the container being moved, CBP had not yet granted entry for the container. Therefore, the container should not have been transferred to First Warehouse.

39. According to CW1, YIM CHI WONG has her own "customers" and the defendant GREENBERG has assisted her in smuggling shipments through KDL. For example, CW1 has informed agents that a shipment under airway bill number 406-05800130, which arrived at JFK on or about December 19, 2006, was for YIM CHI WONG. The shipment was examined and found to contain counterfeit Chanel handbags.

40. The investigation has also revealed that the defendant KWOK KEUNG WONG together with his wife, the defendant YIM CHI WONG, also known as "Jean Wong" (collectively, "the WONGs"), have wired money to "ATL Global Company Limited," located in Hong Kong ("ATL Hong Kong"). A review of wire records of a Citibank account jointly controlled by the WONGs indicate

---

[8]/Information provided by CW2 has proven to be reliable and has been corroborated by independent sources, including, but not limited to, agent surveillance. CW2 has pleaded guilty to a federal crime and is cooperating with law enforcement with the expectation of receiving a lesser sentence.

that, between January 2005 and April 2006, YIM CHI WONG wired approximately $6 million dollars to ATL Hong Kong, at address Rm. 302B, 3/FL., Tower 2, 9 Sheung Yuet Road, Enterprise Square Kowloon Bay, Kowloon.

41.    According to shipping records and inspection of some of the containers shipped, ATL Hong Kong has shipped containers of counterfeit goods to the co-conspirators involved in the instant conspiracy.  For example, ATL Hong Kong sent air shipment 494-01548621 to KDL, which arrived at JFK on or about June 30, 2006.  The shipping documents listed the address for ATL Hong Kong as Rm. 302B, 3/FL., Tower 2, 9 Sheung Yuet Road, Enterprise Square Kowloon Bay, Kowloon.  The air shipment was intercepted by Customs, examined and found to contain counterfeit goods, including: 7500 Rolex watches, 4512 Coach tote bags, 1440 Louis Vuitton handbags, 16 counterfeit Marc Jacobs tote bags, 37 Hermes wallets, 34 Chloe tote bags, 75 Louis Vuitton wallets, 3 Christian Dior tote bags, 7 YSL tote bags, 8 Jimmy Choo tote bags, 10 Balenciaga tote bags, 1540 pairs of Nike sneakers, and 30 pairs of Chloe ladies' shoes, with the total MSRP of $56,173,254.

42.    On or about October 29, 2006, air shipment 369-40065502 from ATL arrived at JFK and was bound for KDL.  The address for ATL Hong Kong listed on the shipping documents is Rm. 302B, 3/FL., Tower 2, 9 Sheung Yuet Road, Enterprise Square,

Kowloon Bay, Kowloon, Hong Kong. The air shipment was intercepted by Customs, examined and found to contain counterfeit watches and handbags, with a MSRP of approximately $13,707,000.

### SCHLOMO GREENBERG and JOHN SCIARA

43. The defendant SCHLOMO GREENBERG operates a freight forwarding company known as "Payson International," (hereinafter "Payson"), which is also known as "Yes Global Express" (hereinafter "Yes"), and "Haizhou (USA) International Logistics" (hereinafter "Haizhou").

44. The defendant JOHN SCIARA is the licensed broker of the customs brokerage "John Sciara CHB," located at 10 Merrick Road, Suite 210, in Valley Stream, New York.

45. According to CW1, GREENBERG began utilizing the above-described smuggling scheme at KDL sometime in 2005. According to CW1, the defendants RONALD and JOSEPH DEPAOLA introduced CW1 to GREENBERG, together, they began utilizing the KDL and the PTT scheme for shipments to customers of GREENBERG and the DEPAOLAs. As discussed above in paragraphs 23 through 27, the scheme involved presenting Customs with fraudulent information about the contents and importers of the containers and moving the containers prior to Customs' grant of entry. GREENBERG was also involved in arranging for "dummy" freight or "replacement freight" to be trucked over to a Customs Exam Site when a container was selected for inspection.

46.     According to CW1, GREENBERG had access to the
names of legitimate importers that he fraudulently used on the
documents in support of the PTTs.  He also provided these names
to others involved in the conspiracy for a fee.

47.     In a recorded conversation on or about April 20,
2006, between CW1, RONALD and JOSEPH DEPAOLA made reference to
GREENBERG providing him with importer names to use fraudulently:

> J. DEPAOLA: ...Let me tell you something.  We
> don't even need [GREENBERG] for the fucking names.
> Could we trust this asshole not to open his mouth?
> He has access to the boxes with all the names, he
> gets all the IRS numbers.  They must buy them.

According to CW1, GREENBERG is also in charge of finding Customs
brokers to file the formal entry documents with Customs.

48.     Statements of CW1 and documents obtained from the
KDL facility, reveal that, between June 2005 and March 2006, over
100 shipments for which GREENBERG provided the paperwork were
smuggled pursuant to the scheme.

49.     Additionally, information obtained from CW1,
combined with a review Customs records, surveillance, documents
and information obtained from victims of the identity theft
involved in the schemes, reveal that approximately 150 additional
shipments were smuggled by GREENBERG after March 2006.  Some of
those shipments are described below.

50.     On or about April 16, 2006, air shipment 180-
40267113 was seized and examined by Customs at John F. Kennedy

Airport ("JFK"). Paperwork submitted in connection with the application for entry of the container listed the name and federal identification number of a legitimate importer (hereinafter "Company A"), and indicated that the shipment would be marked "Payson," which is GREENBERG's company, as discussed in paragraph 8 above. The documents listed the contents of the container as plastic picture frames. The container was found to contain counterfeit Louis Vuitton handbags with a MSRP of $1.9 million. Representatives of Company A have informed Customs that their importer name and identification number were used fraudulently without their authorization to import this shipment. Company A has also complained on earlier occasions that their importer name and number were used fraudulently, for example, with regard to container EMCU9253563, which container's shipping documents indicate the fax number of Payson as the contact information and lists the goods as "Plastic toys (car)."

51. On or about May 13, 2006, air shipment 180-39284980 was seized and examined by Customs at JFK and found to contain counterfeit handbags and sneakers with a MSRP of 5.5 million. On or about May 15, 2006, in an attempt to learned who imported the container, ICE agents visited the customs brokerage listed on the entry documents (hereinafter "Customs Brokerage A"). The agents interviewed a manager of Customs Brokerage A. He/she provided the agents with the bill of lading and invoices

for the container, and he/she indicated that they were given to him/her by the defendant CHRISTINE DEJOHN at Payson. The documents indicate that they were faxed from YES Global Express, an alias of GREENBERG's company as discussed in paragraph 8 above. Agents subsequently obtained, from a Payson employee, additional paperwork for the shipment. That paperwork listed the goods as plastic picture frames.

52. The manager from Customs Brokerage A also provided paperwork given to him/her by Payson for approximately 18 other ocean and air shipments for which he/she filed entry with Customs on Payson's behalf. After reviewing the paperwork for each of the 18 shipments and investigating and/or interviewing the importers listed on the documents, we determined that each of the importer names on the paperwork was used without the importers' authorization.

53. On May 25, 2006, an employee of a legitimate wearing apparel importer (hereinafter "Company B") contacted Customs and stated that the importer's name was used fraudulently to attempt to import container NYKU5772670 into the United States through the New York Container Terminal in Staten Island, New York, on or about May 23, 2006. The bill of lading and arrival notice for the container list the contents as "plastic toy cars," which Company B stated were not imported by them. The documents also indicated that they were faxed to the customs broker by YES

28

Global Express, and the arrival notice indicates that the contact person was "Christine." As discussed in paragraph 11 above, the defendant CHRISTINE DEJOHN is a manager at Payson. In addition, the phone number listed on the shipping documents is a number used by Payson. On or about June 2, 2006, ICE agents interviewed an employee of the Customs brokerage listed on the shipping documents (hereinafter "Customs Brokerage B"). The employee stated that "Christine" from Payson was pushing him/her to make entry for container NYKU5772670.

54. On or about June 5, 2006, agents contacted an employee of the Customs-bonded facility listed on the PTT for the container. That employee stated that he/she had not authorized anyone to use his/her customs bonded facility for the container in question. The individual placed a consensually monitored call to the defendant GREENBERG, who told the individual that listing his Customs-bonded facility was an error and the container freight station should have been listed on the PTT as KDL. GREENBERG subsequently emailed the individual and stated that he asked the "broker" to "switch" the container to the "right facility (KDL 625) right away."

55. An employee of Customs Brokerage B was subsequently asked by the defendant CHRISTINE DEJOHN to pull the paperwork for container NYKU5772670 and discard it. On or about June 6, 2006, another Customs brokerage (hereinafter "Customs

Brokerage C") filed entry documents for container NYKU5772670.
On or about June 13, 2006, agents spoke with employees of Customs
Brokerage C, who stated that the shipping documents for the
container were provided by Payson.  Customs records also indicate
that, again, Payson fraudulently used the identity of Company B
as the importer for this container.  Customs agents also learned
that the container never went to a Customs-bonded facility, but
was picked up from the New York Container Terminal in Staten
Island, New York, on or about May 31, 2006 and delivered to a
storage facility in Long Island City on that same date.[2/]

        56.   Employees of Customs Brokerage B also provided
paperwork given to them by employees of Payson for approximately
9 additional ocean and air shipments for which they filed entry
on Payson's behalf.  These documents contained fraudulent
information as to the importer and as to the customs bonded
warehouse to where the containers were supposed to be delivered.
One of the containers, container HDMU6919796, was selected for
examination by Customs.  The designated examination site for the
container was H & M Customs Exam Site ("H & M").  Documents and
interviews conducted at H & M revealed that the container

_____

[2/]Customs records indicate that Company B's name was fraudulently
used by GREENBERG on several other occasions, including three
containers, CBHU9884959, CBHU9825175, and CBHU8039130.  The
invoices for the containers listed the goods as toys, but at
least one of the three was found to contain counterfeit Nike
sneakers.

produced for examination came from KDL and not the Customs-bonded facility listed on the PTT for the container. According to CW1, the container delivered to H & M contained "replacement freight" because the actual container had already been delivered to the customer.

57.    Over the course of the investigation, agents learned through information obtained from CW1, as well as documents, Customs records, and interviews with importers whose identities were fraudulently used, that GREENBERG had imported approximately 77 ocean containers through the customs brokerage of the defendant JOHN SCIARA, "John Sciara CHB," each shipment fraudulently using unwitting importers' names and federal identification numbers. Several of those shipments were seized.

58.    For example, container CBHU8197686, which arrived on or about August 15, 2006 at Port Newark, was seized. It was found to contain counterfeit Nike sneakers, with a MSRP of $592,500. The invoice and arrival notice for this container listed phone numbers used by GREENBERG and Payson. The container was imported using the importer name and federal identification number for a legitimate company (hereinafter "Company C"). That company has confirmed in writing that the company's importer name was used unlawfully to import this container. CW1 has also informed agents that this was a shipment for which the defendants RONALD and JOSEPH DEPAOLA had filed a PTT.

59.    Container TRLU5741913, which arrived on or about September 17, 2006 at Port Newark, was another shipment for which the defendant JOHN SCIARA filed entry on behalf of GREENBERG and the DEPAOLAs.  According to CW1, the defendants RONALD and JOSEPH DEPAOLA had filed a PTT for this container.  Customs then placed a hold on the container, examined it and found it to contain counterfeit Nike sneakers with a MSRP of approximately $1,018,500.  The contact phone and fax numbers listed on the shipping documents for the container are used by Payson and GREENBERG.  The documents listed the name and federal identification number of a legitimate company ("Company D").  A letter from a representative of Company D to Customs expressed concern that the company's identity was being used fraudulently and stated that the company "is not in the shoe or sneaker business and have never ordered Nike Air Jordan sneakers or any other sneakers at any time."  The defendant JOHN SCIARA filed entry for this container.

60.    Another container GREENBERG and the DEPAOLAs attempted to smuggle using JOHN SCIARA's services is container CBHU9926099, which arrived at Port Newark on or about August 13, 2006.  SCIARA filed entry for this container, and the contact phone and fax numbers listed on the shipping documents for the containers are used by GREENBERG and Payson.  The container was examined and found to contain counterfeit Louis Vuitton, Gucci,

Coach, and Chanel suitcases, handbags and wallets with a MSRP of approximately $12,432,940. A representative of the importer listed on the shipping documents (hereinafter "Company E") informed Customs that Company E did not import the container.

61. Another container, CBHU8360432, which arrived at Port Newark on or about August 8, 2006, was examined and seized. It was found to contain generic sneakers.[10] The invoice and arrival notice for this container listed phone number (347) 632-0777 and fax (718) 856-8930 as contact numbers, which numbers are used by GREENBERG and Payson. The importer name and federal identification number listed on the entry documents belong to a company that primarily imports perfumes out of Germany and does not import sneakers from China. Based on information developed during the course of this investigation, including the statements of CW1, the contents of that container are believed to be "replacement freight" to be used by the co-conspirators at a later date.

62. On or about November 9, 2006, CW1 provided information that JOHN SCIARA had stopped filing entry for GREENBERG's containers under company "John Sciara CHB," and had started using another Customs brokerage (hereinafter "Customs Brokerage D"). CW1 informed agents that an employee of Customs

---

[10]The container was seized because, during examination, it was revealed that the container contained more cartons of goods than listed on the shipping documents.

Brokerage D was filing the entries for Payson per SCIARA's referral.

63.     On or about December 5, 2006, I interviewed an employee of Customs Brokerage D. I showed the employee a list of containers I had suspected GREENBERG of importing using the filer code for Customs Brokerage D. He/she provided me with paperwork for the containers and indicated that he/she had obtained the paperwork from employees of Payson. He/she also stated that Payson was a "client" of the defendant JOHN SCIARA and that he/she was filing the entries for Payson pursuant to direction from SCIARA. The paperwork included emails from the defendant CHRISTINE DEJOHN at Payson, entry paperwork for the containers, shipping documents for the containers with Payson's telephone and fax number listed therein, fraudulent power of attorneys for the importers of the container, and invoices and copies of checks from Payson for fees associated with the importing of the containers. A review of these documents reflect that, in or about and between August 2006 and November 2006, approximately 33 containers imported using the filer code for Customs Brokerage D were imported fraudulently by Payson.

64.     Emails obtained from Customs Brokerage D evidence the fraud. For example, an email from the defendant CHRISTINE DEJOHN to an employee of Customs Brokerage D, dated September 15, 2006, states the following:

> Please see attached change of address for Payson.
> Please also note that all freight needs to be
> diverted to
>
> PAYSON INTERNATIONAL C/O
> SWINGLINE AIR & OCEAN
> 230-59 INTERNATIONAL AIRPORT CENTER BLVD
> SPRINGFIELD GARDENS, NY 11413
>
> We will be notifying all Vendors, Shipper and
> Consignee's [sic]
>
> IT IS IMPORTANT THAT THIS EMAIL IS
> ACKNOWLEDGED.....PLEASE CONFIRM RECEIVED.

The purpose of this email is to divert containers to KDL as

opposed to the address of the importer whose identity was stolen

and listed on the fraudulent shipping documents.

     65.   Several containers reflected on the documents

provided by Customs Brokerage D were seized and found to contain

counterfeit goods.  Those include:

          a.   Container UACU5047435, which arrived at Port
Newark on or about October 11, 2006,
contained counterfeit Nike sneakers with a
MSRP of $993,000.  This container was
imported using the stolen identity of a
company that imports leather goods out of
Korea ("Company F").

          b.   Container TRLU4960917, which arrived at Port
Newark on or about October 31, 2006,
contained counterfeit Nike sneakers with a
MSRP of $1,260,000.  The identity of a

legitimate importer ("Company G"), was

fraudulently used to import this container.

c. Container TTNU9164889, which arrived at Port

Newark, on or about November 3, 2006,

contained counterfeit Nike sneakers with a

MSRP of $1 million. This container was

imported using the stolen identity of a

company that imports wearing apparel

("Company H").

d. Container TRLU5439349, which arrived at Port

Newark on or about November 3, 2006,

contained counterfeit Louis Vuitton and Coach

handbags with a MSRP of approximately $5.6

million. The stolen identity of a legitimate

importer ("Company I"), was used to import

this container.

66. The investigation also revealed that GREENBERG was

smuggling shipments of counterfeit goods by using the filer code

of another customs brokerage (hereinafter "Customs Brokerage E").

On December 6, 2006, I interviewed an employee of Customs

Brokerage E and showed him/her a list of containers I had

suspected GREENBERG of importing using the filer code for Customs

Brokerage E. He/she presented me with paperwork for the

containers and stated that he/she had obtained the paperwork from

employees of Payson.  He/she also stated that he/she was doing
the entries on recommendation of JOHN SCIARA.  The paperwork
included emails from the defendant CHRISTINE DEJOHN at Payson,
entry paperwork for the containers, shipping documents for the
containers with Payson's telephone and fax number listed therein,
fraudulent power of attorneys for the importers of the container,
and invoices to Payson for fees associated with the importing of
the containers.

        67.  The documents reflect that, in or about and
between November 2006 and December 2006, approximately 28
containers imported using the filer code for Customs Brokerage E
were imported through the fraudulent use of unwitting importer
names and federal identification numbers, including two
containers that were seized, containers HDMU6910838 and
CCLU6186846.  The shipping documents for these containers listed
fax and phone numbers used by GREENBERG and Payson as the contact
information.  Container HDMU6910838 was seized and found to
contain counterfeit Nike sneakers with a MSRP of $297,000.  The
shipping documents for the container fraudulently listed the
importer name and number of a company that imports chemicals,
hereinafter "Company J."  Correspondence from representatives of
Company J indicates that the company's importer name and number
were fraudulently used to obtain entry of this container.
Container CCLU6186846 was seized and found to contain counterfeit

Timberland workboots with a MSRP of approximately $772,560. The
shipping documents for this container fraudulently listed the
importer name and number of a company that primarily imports
wearing apparel from Pakistan (hereinafter "Company K").

68. The investigation also revealed that GREENBERG
smuggled shipments of goods using United Parcel Service ("UPS").
On or about June 7, 2006, CW1 informed agents that GREENBERG was
going to be using UPS to smuggle shipments. A Customs officer
subsequently found a UPS shipment on a flight from China that
listed Payson as the consignee. The shipment (airway bill 406-
03267353), which arrived at JFK on or about June 10, 2006, was
examined and found to contain 5,796 counterfeit Coach handbags
and 4,800 counterfeit Coach wallets, with a total MSRP of $1.6
million.

69. On or about December 12, 2006, CW1 informed agents
that he was present during a conversation GREENBERG had with "Rob
Rossomango" about smuggling containers through UPS to be sent to
ROSSOMANGO's warehouse, J & J Air Freight, Inc., located in
Jamaica, New York. According to CW1, the defendant ROSSOMANGO
agreed to assist GREENBERG and provided GREENBERG with written
instructions on shipping the containers. Agents subsequently
targeted two shipments slated for delivery to ROSSOMANGO's
warehouse: airway bill 406-03305831, said to contain 189 cartons
of baby tricycles and baby walkers, and airway bill 406-05800130,

38

said to contain 100 cartons of shoes.  These shipments arrived at JFK on or about December 19, 2006.  The contact number for those shipments was (347) 697-5776, which number is used by Payson, the defendant GREENBERG's company.  Prior to delivery, these containers were examined and found to contain counterfeit goods: the shipment associated with airway bill 406-03305831 contained counterfeit designer watches, and the shipment associated with airway bill 406-05800130 contained counterfeit Chanel handbags. Customs officers took samples and photographs of the shipment's contents.

70.    On or about December 20, 2006, although the shipments were already covertly examined, a Customs official traveled to ROSSOMANGO's warehouse to conduct a customs examination of air shipments 406-03305831 and 406-05800130.  The Customs official was presented with "replacement freight," namely, baby tricycles and "S.Z.D." brand men's shoes.

71.    On or about February 4, 2007, Customs learned of another UPS air shipment GREENBERG attempted to smuggle into the United States.  The shipment (airway bill 406-03312993) was on a flight from China and listed "JK 88 Trading" as the consignee and listed a contact number used by Payson.  The manifest listed the contents as "plastic toy cars."  The shipment was seized on or about February 6, 2007, when it arrived at JFK.  It was found to contain 54,688 counterfeit watches, 1,135 counterfeit handbags,

and other counterfeit merchandise, with a MSRP of approximately $414 million.

72.    On February 12, 2007, another UPS air shipment GREENBERG attempted to smuggle through J & J JFK was seized by Customs at the J & J JFK facility.  The shipment (airway bill 406-07330621) was originally on a flight from China and fraudulently listed a legitimate importer (hereinafter "Company L").  The manifest listed the contents as silk pants.  The shipment, which arrived at JFK on or about February 10, 2007, was seized and found to contain counterfeit Coach handbags, as well as counterfeit Chanel metal plates, Coach labels and Chloe labels that would be used in the making of counterfeit handbags.

### RONALD AND JOSEPH DEPAOLA

73.    The defendants RONALD and JOSEPH DEPAOLA operate a trucking company known as "Jetex," also known as "Swingline." Beginning in or about March 2004, the DEPAOLAs began working out of the KDL facility located at 230-59 International Airport Center Boulevard in Springfield Gardens, New York, and used KDL to store their trucks.  They allowed employees and associates of KDL to use their trucks for KDL business.  According to CW1, the DEPAOLAs became involved in the above-described PTT scheme at KDL sometime in 2005.  The DEPAOLAs introduced CW1 to SCHLOMO GREENBERG and, together, they began utilizing the KDL and the PTT scheme for shipments for the DEPAOLAs' customers and GREENBERG's

customers.  According to CW1, these shipments contained counterfeit goods and clothing apparel for which the shipping documents indicated a lower duty than was actually owed.  CW1 stated that, where a shipment was for GREENBERG's customers, GREENBERG would pay him or her and the DEPAOLAs brothers $3,000 for their assistance in smuggling a container.  CW1 also informed agents that the DEPAOLAs were responsible for trucking the "dummy" or "replacement" shipments to the Customs Exam Site in the event an exam was required by Customs.

74.  A recorded conversation on or about April 20, 2006, between CW1 and RONALD and JOSEPH DEPAOLA, demonstrates the DEPAOLAs involvement in the scheme and knowledge of the illegality of their actions.  In this conversation, the parties discussed containers which were slated to go to a "General Order Warehouse," where Customs sends containers when entry is not made after a certain period of time or a container is not picked up. In the conversation, RONALD and JOSEPH DEPAOLA discussed the PTT scheme, made reference to the fraudulent nature of the goods within the containers, and discussed their concern that Customs would learn of the scheme:

> J. DEPAOLA: Yeah, if the stuff don't go in today.  We got three more going into G-O. Then it's really going to hit the fan.
>
> ... Then you are going to see a major, major, major problem.  That's all.  That's serious shit, right. You'll have a major investigation.

R. DEPAOLA:  The way [Greenberg] sounded like he was afraid to put them in? [unintelligible] We have no choice.

J. DEPAOLA:  He said he's going to come over to talk. What's there to talk about pal.  You're the one who got us into this mess.

R. DEPAOLA:  They gotta go in.

J. DEPAOLA:  What is there to talk about?  They gotta go in.

J. DEPAOLA:  Do you think if we snuck them through Customs they would get by on a PTT.  What do you think? Those other two went through.  Did the test runs go through? If they were going to break balls they would have put a hold on these, right?

R. DEPAOLA:  It's a roll of the dice.

J. DEPAOLA:  They don't have a list of customers.  I don't believe that shit.  If you put a PTT, do you think our customer is going to pop up.  No fucking way. I don't think so.  Want to roll it? What the fuck. What do we got to lose?

. . .

Tomorrow morning the trucks will be over there picking them up for G-O [the General Order Warehouse].  Oh man. I don't even want to think what they would do. Imagine bringing that shit back to the G-O warehouse and popping those?  Oh man. I don't even want to think what they would do.  This would really open this up, right. I think they would just come down and haul us all in. Everybody, you're coming in for questioning right now.

Some of the shipments handled by the DEPAOLAs are described

below.

75.   Conversations with employees of a

transportation/trucking company used by the DEPAOLAs (hereinafter

"Trucking Company A"), and documents provided by these employees,

reveal that on several occasions between April 2006 through
September 2006, both dates being approximate and inclusive,
RONALD and JOSEPH DEPAOLA would instruct Trucking Company A to
pick up containers from the ports, including Port Newark, for
which RONALD and JOSEPH DEPAOLA had filed a PTT.  The PTTs for
these containers listed Ultimate Media Express Container Freight
Station ("UEX") as the bonded facility to which the containers
were to be taken.  According to the Trucking Company A, however,
they were instructed by the DEPAOLAs to deliver the containers
not to UEX, as authorized by Customs, but rather, to KDL or to
the warehouse run by the defendant KWOK KEUNG WONG, the First
Warehouse.  Furthermore, fraudulent delivery orders provided by
RONALD and JOSEPH DEPAOLA during a voluntary interview purport to
indicate that the containers were delivered to "X.N.G., Inc.," at
154 Broome Street, IH, in New York, New York.  Surveillance of
154 Broome Street reveals that it is a residence, not a
warehouse, and does not have the capacity for a flatbed truck or
other conveyance to accept a large container.

          76.   Documents provided by RONALD and JOSEPH DEPAOLA on
or about October 4, 2006, evidence additional containers smuggled
pursuant to the above-described scheme.  Those documents,
together with the documents from Trucking Company A, indicate
that approximately 47 containers were smuggled by the DEPAOLAs
pursuant to this scheme between April 2006 and September 2006.

The documents and information from CW1 also demonstrate that the DEPAOLAs used the services of the defendant JOHN SCIARA in smuggling those containers. Some of the containers smuggled by the DEPAOLAs are described below.

77. The documents provided by Trucking Company A show that container GSTU6770508, which arrived at Port Newark on or about September 6, 2006, was a shipment for which RONALD and JOSEPH DEPAOLA had filed a PTT to UEX according to the above scheme. According to employees of Trucking Company A, they were instructed by the DEPAOLAs to deliver this container to First Warehouse and that they did deliver the container there on or about September 25, 2006. On or about October 2, 2006, ICE agents went to UEX and asked to examine the container GSTU6770508. The agents were directed to cardboard boxes each labeled "shower curtains" wrapped together and bearing a label with the designation "GSTU6770508". Based on information developed during the course of this investigation, including the statements of CW1, the items displayed to the agents were "replacement freight" designed to disguise the fact that the container had been moved prior to Customs authorization.

78. Several of the containers smuggled by the defendants RONALD and JOSEPH DEPAOLA, together with the defendant GREENBERG, are described above in paragraphs 58 through 60.

CHRISTINE DEJOHN

79. The defendant CHRISTINE DEJOHN is a manager at Payson. The investigation has revealed that, in that capacity, she has assisted the defendants GREENBERG and the DEPAOLAs in the smuggling of several containers of counterfeit goods using the schemes described above. Defendant DEJOHN is listed as the contact person on many of the documents recovered from the KDL facility evidencing over 100 shipments smuggled by GREENBERG and others between June 2005 and March 2006. Since March 2006, the defendant DEJOHN has continued to assist in the smuggling, and examples of her activity are described below. *Per CWI, DEJOHN is aware of the fraudulent use of importer names and numbers on the shipping documents and is aware*

80. As noted above in paragraph 51, on or about May 13, 2006, air shipment 180-39284980 was seized and examined by Customs at JFK and found to contain counterfeit handbags and sneakers with a MSRP of 5.5 million ("the May 13, 2006 shipment"). *that containers are moved prior to Customs' release.* On or about May 15, 2006, ICE agents visited the customs brokerage listed on the entry documents for the May 13, 2006 shipment, Customs Brokerage A, and interviewed the manager. He/she provided the agents with the bill of lading and invoices for the container and indicated that they were given to him/her by the defendant CHRISTINE DEJOHN at Payson. The documents indicate that they were faxed from YES Global Express, which, as described above in paragraph 8, is an alias for Payson. The manager of Customs Brokerage A also stated that he/she had

received a call from DEJOHN that morning inquiring about the shipment and that she had informed DEJOHN that Customs had placed a hold on the shipment.

81.   On or about May 15, 2006, ICE agents visited the Payson offices at 147-38 182nd Street in Jamaica, New York, and inquired about the May 13, 2006 shipment.  An employee of Payson provided the agents with paperwork for the container, which listed the goods as plastic picture frames.  The paperwork also included a letter to Korean Air on Haizhou[11]/ letterhead dated May 12, 2006 from the defendant CHRISTINE DEJOHN, seeking a PTT to move the container to a trucking company (hereinafter "Trucking Company B").  In the letter, DEJOHN identified herself as an employee of the "Air Import department" of Haizhou.  While at Payson, agents asked to speak with DEJOHN and were informed that she was out of the office.  An employee agreed to place a call to DEJOHN, and during the call, DEJOHN told agents that she began working at Payson in March 2006 and was working on imports.  She also stated that she had previously worked at YES Global Express as the office manager.

82.   As noted above in paragraph 52, the manager of Customs Brokerage A also provided agents with paperwork given to him/her by Payson for approximately 18 other ocean and air

---

[11]/Haizhou is an alias for GREENBERG's company, as noted above in paragraph 8 above.

shipments for which he/she filed entry on Payson's behalf. According to the manager, he/she corresponded with the defendant DEJOHN concerning the containers imported for Payson.

83.   As discussed above in paragraph 55, agents also learned that the defendants DEJOHN and GREENBERG smuggled container NYKU5772670 into the United States through the New York Container Terminal in Staten Island, New York, on or about May 23, 2006.

84.   As discussed above in paragraph 56, employees of Customs Brokerage B also provided paperwork given to them by Payson for approximately 9 additional ocean and air shipments for which they filed entry on Payson's behalf.   The documents list "Christine" as the contact person and a phone number used by the defendant DEJOHN.   The documents contained the fraudulent information about the importer and about the customs bonded warehouse to where the containers were supposed to be delivered.

85.   On or about June 5, 2006, employees of Customs Brokerage B, including the owner and vice-president, agreed to engage in an electronically monitored meeting with the defendant CHRISTINE DEJOHN.   ICE agents were positioned in an adjacent office to the conference room where the meeting was held.   At the meeting, the owner of Customs Brokerage B informed the defendant DEJOHN that he was very concerned about the shipments that Customs Brokerage B did on behalf of Payson, in light of the fact

that the identity of his clients were used fraudulently by Payson and that Payson provided customs brokers with fake power of attorneys for those companies. DEJOHN stated that sales clerks in her office were responsible and she would look into it. The very next day on or about June 6, 2006, Payson obtained entry for container NYKU5772670 by again fraudulently using the name and federal identification number of Company B.

86. As noted above in paragraph 63, an employee of Customs Brokerage D provided information to law enforcement which further demonstrated the defendant DEJOHN's knowledge and participation in the smuggling scheme. As noted above, the employee provided agents with paperwork for the containers, including paperwork from CHRISTINE DEJOHN at Payson. The documents reflect that, in or about and between August 2006 and November 2006, approximately 33 containers imported using the filer code for Customs Brokerage D were imported through the fraudulent use of unwitting importer names and federal identification numbers. Agents seized 4 of those containers, which are described above in paragraph 65.

87. As noted above in paragraph 64, one of the emails from DEJOHN to Customs Brokerage D, dated September 15, 2006, stated the following:

> Please see attached change of address for Payson.
> Please also note that all freight needs to be
> diverted to

> PAYSON INTERNATIONAL C/O
> SWINGLINE AIR & OCEAN
> 230-59 INTERNATIONAL AIRPORT CENTER BLVD
> SPRINGFIELD GARDENS, NY 11413
>
> We will be notifying all Vendors, Shipper and
> Consignee's [sic]
>
> IT IS IMPORTANT THAT THIS EMAIL IS
> ACKNOWLEDGED.....PLEASE CONFIRM RECEIVED.

The purpose of this email is to divert containers to KDL as opposed to the address of the importer whose identity is stolen and listed on the fraudulent shipping documents.

88.   Another email from DEJOHN to Customs Brokerage D, dated October 13, 2006, referenced a container being "sold in transit" and stated in bold lettering: "DO NOT PUT THIS ENTRY IN."   The email also stated: "I told John [Sciara] about this already if you have any questions please speak with him."   DEJOHN subsequently provided Customs Brokerage D with a letter purporting to be from the manufacturer of the goods indicating that the container was sold in transit to a legitimate importer, hereinafter "Company M."   The importer originally listed on the shipping documents for the container was a different legitimate importer, hereinafter "Company N."   On or about November 9, 2006, CW1 informed agents that GREENBERG had mentioned that the defendant JOHN SCIARA had previously received a telephone call from Company N, complaining that its identity had been fraudulently used and asking that SCIARA cease from using its identity to import goods.   Therefore, the purpose of the October

13, 2006 email was to change the importer listed on the entry documents because Company N had learned that its information had been used fraudulently.

89.   As noted above in paragraph 66, an employee of Customs Brokerage E also provided information to law enforcement which further demonstrated the defendant DEJOHN's knowledge and participation in the smuggling scheme.  As noted above, the employee provided agents with paperwork for the containers, including paperwork from CHRISTINE DEJOHN at Payson.   The documents reflect that, in or about and between November 2006 and December 2006, approximately 28 containers imported using the filer code for Customs Brokerage E were imported through the fraudulent use of unwitting importer names and federal identification numbers.

90.   During the meeting on December 6, described above in paragraph 66, an employee of Customs Brokerage E indicated that he/she had received an email from the defendant CHRISTINE DEJOHN asking to file entry for containers MSCU9574238 and GESU4272491.  The employee agreed to place a consensually-monitored telephone call to the defendant DEJOHN.  During the call, the employee informed the defendant DEJOHN that a Customs agent was present and asked DEJOHN if she still wanted him/her to file entry for the two containers.   DEJOHN told him/her to "hold off" on filing entry.  Entry for container MSCU9574238 was

subsequently filed by another customs brokerage on or about December 11, 2006. Container MSCU9574283 was seized and found to contain counterfeit Nike sneakers, with a MSRP of $712,000. The shipping documents for the container fraudulently listed the importer name and number of a legitimate importer, hereinafter "Company O." Entry was never filed for container GESU4272491, but it was seized and was found to contain counterfeit Coach handbags and wallets with a MSRP of over $7 million. The shipping documents for the container fraudulently listed the importer name and number of Company I.

ROBERT ROSSOMANGO

91. ROBERT ROSSOMANGO is the warehouse manager of a Customs-bonded facility known as J & J Air Freight, Inc., located at 150-18 132nd Avenue in Jamaica, New York (hereinafter "J & J JFK"). All air shipments for UPS for New York go through J & J JFK.

92. As noted above in paragraphs 69 through 72, the investigation revealed that GREENBERG smuggled several containers using UPS and ROSSOMONGO's facility. For example, on or about June 7, 2006, CW1 informed agents that GREENBERG was going to be using UPS to smuggle containers. Agents subsequently found a UPS shipment on a flight from China, bound for J & J JFK, that listed Payson as the consignee. The shipment (airway bill 406-03267353) was examined and seized and was found to contain 5,796

counterfeit Coach handbags and 4,800 counterfeit Coach wallets, with a MSRP of $1.6 million.  Phone records for telephone number (646) 302-3417, which ROSSOMANGO provided to a Customs official as his contact number, indicate phone calls on or about June 5, 2006 and June 7, 2006, between ROSSOMANGO and a phone number used by GREENBERG.

93.   As noted above in paragraph 69, agents targeted two other shipments slated for delivery to J & J JFK: airway bill 406-03305831, said to contain 189 cartons of baby tricycles and baby walkers, and airway bill 406-05800130, said to contain 100 cartons of shoes.  The contact number for those shipments is (347) 697-5776, which number is used by Payson.  The consignee for airway bill 406-03305831 was listed as "JK 88 Trading."

94.   Prior to delivery of these shipments to J & J JFK, Customs officials had attempted to divert the containers to a UPS facility so that the containers could be examined.  On or about December 19, 2006, the shipments were, however, erroneously trucked over to ROSSOMANGO's warehouse.  When the truck driver learned of his error and began to leave, ROSSOMANGO indicated that he was expecting the shipments and argued that they should be unloaded.  ROSSOMANGO escorted the driver to the UPS facility and was later observed pacing back and forth in front of the facility talking on a cell phone.  Customs eventually examined the shipments and found that the shipment under airway bill 406-

03305831 contained counterfeit designer watches, and the shipment associated with airway bill 406-05800130 contained counterfeit Chanel handbags. Customs officials took samples and photographs of the shipment's contents.

95. On or about December 20, 2006, although the shipments were already covertly examined, a Customs official traveled to ROSSOMANGO's warehouse to conduct a Customs examination of shipments. At the warehouse, for the examination of the shipment airway bill 406-03305831, ROSSOMANGO presented the Customs official with cardboard boxes containing baby tricycles. An enlarged photocopy of the UPS airway bill label purporting to be for 406-03305831 had been placed on the "skid" of cardboard boxes presented to the Customs official. For the examination of the shipment airway bill 406-05800130, ROSSOMANGO presented the Customs official with cardboard boxes containing "S.Z.D." brand men's shoes. Those boxes bore unusual airway bill labels that appeared to be prepared from a website.

96. According to CW1, ROSSOMANGO and GREENBERG had several conversations concerning the air shipments 406-03305831 and 406-05800130, including one conversation in which ROSSOMANGO admitted to hiding the containers prior to the visit by Customs. CW1 also stated that ROSSOMANGO was paid an extra $500 by GREENBERG for his services (for a total of $2000) because he went "above and beyond" the normal work for these shipments.

97.   As noted above in paragraph 93, the consignee for airway bill 406-03305831 was listed as "JK 88 Trading."  On or about February 9, 2007, agents contacted Customs Brokerage A, which brokerage filed entry for an air shipment consigned to "JK 88 Trading."  Agents inquired as to contact information for "JK 88 Trading."  An employee of Customs Brokerage A provided agents with the name of "Jack Jiang," telephone number (347) 892-0669, fax number (718) 353-691.  Phone records for ROSSOMANGO's telephone number (646) 302-3417, show calls between ROSSOMANGO and the telephone number associated with "JK 88 Trading," telephone number (347) 892-0669, on December 12, 2006, December 18, 2006, December 19, 2006, and December 20, 2006.  On December 19, 2006, there were five calls between ROSSOMANGO and the "JK 88 Trading" telephone number.  Some of the calls on December 19 correlate to the time ROSSOMANGO traveled to the UPS facility in regards to the shipments for airway bills 406-03305831 and 406-05800130, including the time he was observed pacing back and forth in front of the facility talking on a cell phone.

98.   On or about January 8, 2007, Customs examined a shipment under airway bill number 406-05800583, which was designated to be delivered to ROSSOMANGO's warehouse, J & J JFK. The shipping documents listed the contents of the shipment as "shoes."  The shipment was found to contain counterfeit Chanel handbags.  Photographs and a sample of the shipment were taken by

Customs.  A sample handbag had a MSRP of $1,345.  The shipment
was subsequently delivered to J & J JFK.  On or about January 9,
2007, a Customs official traveled to J & J JFK to conduct a
Customs examination of the shipment.  At the warehouse, for the
examination of the shipment airway bill 406-05800583, ROSSOMANGO
presented the Customs official with cardboard boxes containing
black parkas with the brand name "Infinito."  The boxes bore
unusual airway bill labels that appeared to be prepared from a
website.

99.  On or about February 6, 2007, Customs learned of
another UPS air shipment GREENBERG attempted to smuggle through J
& J JFK.  The shipment (airway bill 406-03312993) was on a flight
from China and listed "JK 88 Trading" as the consignee and listed
a contact number used by Payson.  The manifest listed the
contents as "plastic toy cars."  The shipment was examined as it
arrived at J & J JFK, and was seized and found to contain 54,688
counterfeit watches, 1,135 handbags, and other counterfeit
merchandise, with a MSRP of approximately $414 million.

100.  Customs officials also learned that a UPS air
shipment for airway bill 406-03312584 had been delivered to J & J
JFK on or about January 17, 2007 and had been cleared by Customs
on the same date.  The airway bill for the shipment listed the
contents as 246 cartons of baby tricycles and baby walkers.  The
consignee was listed as "JK 88 Trading."  The contact number for

the shipment is (347) 697-5776, which number is used by Payson.
On or about February 9, 2007, agents visited J & J JFK and spoke
to ROSSOMANGO concerning the air shipment.  Agents inquired as to
the identity of the consignee and ROSSOMANGO, after attempting
for approximately an hour and half to locate documents and
contact information for the consignee, could not provide agents
with the consignee's identity.  Several hours later, after agents
left the premises, ROSSOMANGO indicated he had found the
documents.  Phone records reveal telephone calls between
ROSSOMANGO and the telephone number associated with "JK 88
Trading," telephone number (347) 892-0669, on February 5, 2007,
February 6, 2007, and February 8, 2007, February 9, 2007, and
February 10, 2007.

        101.  As noted above in paragraph 72, another UPS air
shipment the co-conspirators attempted to smuggle through J & J
JFK was seized by Customs at the J & J JFK facility on or about
February 12, 2007.  The shipment was found to contain counterfeit
Coach handbags, as well as Chanel metal plates, Coach labels, and
Chloe labels that would be used in the making of counterfeit
handbags.

        YAKOUB SAADIA

        102.  The defendant YAKOUB SAADIA, also known as "Joe,"
"Joe Qureshi," "Jack Saadia" and "Joe Weber," is an importer and
operates a business at 1407 Broadway in New York, New York, under

56

company names including but not limited to "USA Design," "Crest Jeans," "Crest Home Designs," "United Textiles," "Joseph Saloot Logistics" and "Infinity Progress Marketing."

103. As discussed above in paragraph 35, statements of CW1 and documents recovered from the KDL facility reveal that, between June 2005 and March 2006, over 100 shipments originating with WONG's shell companies "Ocean-Run International Freight Forwarder, Inc.," "Prestige Logistics" and "AP Transport Services, Inc.," were smuggled into the United States. The documents recovered from the KDL facility for at least 16 of those shipments listed phone and fax numbers and email addresses associated with SAADIA as the contact information for the consignee or person to be notified upon arrival of the shipment.

104. According to the information provided by CW2, SAADIA and others are involved in schemes to smuggle shipments of goods into the United States prior to the shipments having been released from Customs. CW2 also informed law enforcement that several of the defendants, including the defendant SAADIA, would present "replacement freight" to Customs when Customs sought to examine the shipments that had been smuggled into the United States.

105. According to CW2, in or about February or March of 2006, a customer named "Joe," subsequently identified as the defendant YAKOUB SAADIA, asked CW2 if he/she would assist in

importing shipments of goods and releasing them before Customs
had granted entry.  CW2 agreed to move the containers and began
filing PTTs for the shipments, picking them up from the ports,
bringing them back to his/her warehouse, breaking down the
containers into separate shipments, and then delivering them to
SAADIA's customers or warehouses.

106.  In or about May of 2006, SAADIA then asked CW2 if
he/she would move full containers for SAADIA utilizing the above
scheme without breaking them down.  CW2 agreed.  Between May and
October of 2006, CW2 assisted in smuggling approximately 8
containers of goods per week for SAADIA, for a total of
approximately 200 containers.  Two of the smuggled containers
were intercepted by Customs and found to contain counterfeit
goods.  Those containers are described infra in paragraphs 114
and 115.  In light of the "replacement freight" scheme, several
other of the shipments CW2 assisted SAADIA in smuggling are
suspected of containing a product of a different value, and owing
a different duty, than that invoiced.

107.  Emails from SAADIA to CW2 corroborate CW2's
accounts of SAADIA's participation in the smuggling scheme.  For
example, on or about May 11, 2006, SAADIA sent an email to CW2 in
which he states: "I have got order for 550 shipment [sic]
starting end of May.  I would like to sit down with you, asap to
talk about how we well [sic] handel [sic] this order."  Based on

information developed during the course of this investigation, it is believed that SAADIA is referring to 550 containers he wanted to smuggle through CW2's warehouse. In another email to CW2, dated August 8, 2006, SAADIA wrote: "Please deliver container MSKU4545555 tomorrow if u can it is hot shipment." Documents obtained from CW2 reveal that CW2's company delivered the container to SeaJet/APA Transport (hereinafter "SeaJet") on or about August 9, 2006, prior to its release by Customs. SeaJet is a private warehouse and trucking company that does not possess a Customs bond. Therefore, the container should not have been delivered to Sea Jet without prior clearance from Customs. Shipping documents for the container listed its contents as "comforters."[12]/

108. On several occasions, Custom sought to examine a shipment before granting entry. Because the shipments were moved prior to Customs clearance, SAADIA provided CW2 with "replacement freight" to store at his/her warehouse for examination by Customs. Replacement freight was shown to Customs in reference to their inquiries approximately once a week during the time CW2 was involved in the scheme, in or about and between February 2006 and October 2006. Replacement freight was also shipped by CW2 to

---

[12]/Based on my training and experience and information learned in the investigation, I believe that the co-conspirators falsely stated that the containers contained comforters because comforters are a low-value, low-duty item.

other warehouses used by SAADIA in order to deceive Customs.  A
June 5, 2006 email from SAADIA to CW2 made reference to SAADIA's
sending replacement freight to CW2's warehouse in response to a
request by Customs to examine containers that were supposed to be
held at CW2's warehouse until they were cleared to enter the
United States.  That email stated in pertinent part: "[S]eajet
will deliver the 2 lot between 11 and 12 noon today ... then u
can call h and m to have them pick up or you can deliver to them
directly."  "H & M" is an authorized Customs examination site,
located at 700 Belleville Turnpike, in Kearney, New Jersey.  The
email from SAADIA also contained a cellular telephone phone
number used by him, namely, (917) 250-0088.

        109.  An email from the defendant YAKOUB SAADIA to CW2
reveals that SAADIA assisted the defendant KWOK KEUNG WONG in
smuggling container NYKU5580359 into the United States on or
about July 22, 2006 through Port Newark.  The July 24, 2006 email
contains the subject line "Update NYKU5580359."  SAADIA told CW2
to: "Go ahead and pick up and deliver to First Wehouse [sic]."
On or about August 9, 2006, I conducted surveillance at First
Warehouse and observed container NYKU5580359 in the parking lot
in front of the warehouse.  Customs database checks conducted on
that date revealed that the shipment, said to contain comforters,
arrived at the New York Container Terminal, in Staten Island, New
York, from China on or about July 24, 2006.  Checks also revealed

that, on or about July 21, 2006, J & J International Logistics, Inc., 675 Dowd Avenue in Elizabeth, New Jersey ("J & J Elizabeth"), a Customs-bonded container freight station, filed a PTT to move the container to J & J Elizabeth.  As of August 9, 2006, the date of the surveillance, Customs had not yet granted entry for container NYKU5580359.  Therefore, the container should not have been transferred to First Warehouse.

110.  I visited J & J Elizabeth on or about August 9, 2006, and asked to see container NYKU5580359 and the container was not there.  Customs subsequently requested an official examination of container NYKU5580359.  On or about August 10, 2006, CW2 wrote an email to SAADIA stating "Container NYKU5580359 is the one customs is lookig [sic] for.  Please advise ASAP." SAADIA responded on or about August 10, 2006: "use 126 ctn of comforter that in your whs .. And I iwll [sic] send more today at 3pm."  Later that day, SAADIA sent another email to CW2 referencing container NKYU5580359 which stated: "Add from the 126ctn tha tyou [sic] got yesterday to make it in to 533.ctn." Based on information developed during the course of this investigation, and CW2's understanding of this email communication, SAADIA was telling CW2 to display replacement freight to Customs, namely, 533 cartons of comforters as listed on the shipping documents for container NYKU5580359, because the

container had already been delivered to the customer and upon information and belief, did not include comforters.

111.  On or about August 10, 2006, under the supervision of ICE agents, CW2 attended a meeting with SAADIA, which meeting was recorded.  During the meeting, CW2 and SAADIA discussed my visit to CW2's warehouse and discussed the replacement freight scheme.  CW2 mentioned his/her concern about the fact that they have been presenting Customs with the same replacement freight over and over again.  CW2 noted that black tape is placed on a shipment after it has been examined by Customs and that he/she has to remove that tape after each examination.  SAADIA told CW2 that he would have the replacement freight "reboxed" or "cleaned up" or would "bring you brand new ones."  SAADIA also mentioned the 533 cartons of comforters he wanted CW2 to present to Customs, per his earlier email.  SAADIA also told CW2 about a "big client ... who will give me at least 400 containers every month" and asked CW2 if he/she was "capable of doing more containers ... 120, 130, 150."

112.  In an email dated August 14, 2006 from SAADIA to CW2, SAADIA informed CW2 that SeaJet would deliver 220 cartons of toys for use as replacement freight for a container Customs has asked to examine, container SLSU7008597.  The email also stated, "Pleas [sic] make sure no black tap [sic] on them."

113. In another email, dated August 15, 2006, SAADIA asked CW2 to "please deliver YMLU6125210 to SeaJet today it is hot shipment." A review of the shipping documents for the container revealed that they contained SAADIA's cell phone number, (917) 250-0088, and his alias "Joe Qureshi." The consignees for the container listed on the shipping documents are two shell companies utilized by SAADIA and United Textiles. Documents obtained from CW2 indicate that CW2's company delivered the container to SeaJet on or about August 24, 2006, although the container was not released or cleared by Customs until August 29, 2006. The defendant HENRY MANDIL filed the entry documents for this container.

114. On or about September 6, 2006, SAADIA emailed CW2 and requested that a PTT be filed for container FSCU7055961. On or about September 8, 2006, in a series of consensually monitored telephone calls, CW2 informed SAADIA that Customs placed a hold on container FSCU7055961. SAADIA acknowledged that the container belonged to him and informed CW2 that he would find out what was happening to the container. Container FSCU7055961 was later seized and found to contain counterfeit Nike sneakers with a MSRP of $585,000.

115. On or about October 5, 2006, SAADIA asked CW2 to "Please pick up TCNU9839043 it's good to go. Please deliver Sea Jet." Customs denied the PTT application for the container and

it was seized.  It was found to contain counterfeit Babyphat clothing with a MSRP of approximately $1,358,422.

116.  The investigation has also revealed that SAADIA smuggled containers using other container freight stations.  For example, agents subsequently identified a container that had been imported on a PTT to a Customs-bonded facility known as "Metrobox Container Freight Station LLC" (hereinafter "Metrobox").  Agents believed the container was smuggled into the United States pursuant to the scheme.  Metrobox is located at 123 Pennsylvania Avenue in Kearney, New Jersey.  On or about May 4, 2006, I visited Metrobox and conducted interviews with employees of Metrobox and obtained documents that revealed, among other things, that SAADIA had smuggled at least 18 containers through Metrobox.  The interviews also revealed that SAADIA was working with customs broker the defendant HENRY MANDIL to smuggle these containers.  Some of the containers are described below.

117.  On March 21, 2006, employees of Metrobox obtained a PTT for container HDMU6908527, authorizing the container to be moved from the port to Metrobox's facility.  Prior to the container being granted entry, however, Metrobox delivered the container to SeaJet on or about March 24, 2006.  Shipping documents for the container listed a shell company utilized by SAADIA and United Textiles.  The document listed the contents of

the container as "comforters." Entry for the container was not approved until March 30, 2006.

118. On or about April 11, 2006, employees of Metrobox obtained a PTT for container 00LU7381164, authorizing the container to be moved from the port to Metrobox's facility. Prior to the container being granted entry, however, Metrobox delivered the container to SeaJet on or about April 12, 2006. The container was not released by Customs until June 1, 2006. Shipping documents for the container listed shell companies connected to SAADIA and United Textiles and indicated "Joe Qureshi" as the contact person, with telephone number (917) 250-0088 and fax number (215) 359-1535. The documents listed the contents of the container as "comforters" and "ladies' skirts."

119. On or about August 4, 2006, employees of Metrobox filed an application for a PTT for container HJCU9020715. The container was examined by Customs and found to contain counterfeit Babyphat, counterfeit Marithe Francoise Girbaud, and counterfeit Rocawear clothing, with a MSRP of approximately $1,357,200. The container was seized. Shipping documents for the container listed a shell company connected to SAADIA and United Textiles.

120. Agents also learned that SAADIA has smuggled containers using "Gateway Terminal Services" ("GTS"), a Customs-bonded container freight station located in Edison, New Jersey.

The investigation has revealed that employees of GTS filed PTTs for containers of SAADIA's and then delivered the containers prior to Customs' release.  Additionally, information provided by CW2, and email communication between the defendant YAKOUB SAADIA and CW2, indicate SAADIA's direction to CW2 to send "replacement freight" to GTS.  For example, on or about July 20, 2006, employees of GTS filed a PTT for container HJCU1070216.  The container contained two shipments, one of which was selected for Customs examination on or about July 27, 2006.  That shipment was manifested as 287 cartons of comforters.  On or about August 16, 2006, SAADIA emailed CW2 and asked him to send 287 "clean" cartons of comforters to GTS.  Attached to the email was a delivery order requesting delivery of the 287 cartons to GTS.

121.  Agents also learned that SAADIA has smuggled containers using the above schemes through the use of the Railhead Customs Exam Site and the "logistics" company, "M.Rolon, Limited."  Details are described infra in paragraphs 124 through 157, with regard to the defendants HENRY MANDIL, RAMNARINE TIWARI, also known as "Chris," PHILLIP MCENTEE, JOE VENETUCCI, JUDY FRISCO, JAMES BALL, JOHN HSU, FARAJ SADAKA, also known as "Freddy," and MONIQUE ROLON, also known as "Monique Communale."

122.  The investigation has also revealed that the defendant YAKOUB SAADIA has wired money to an account for "Jiaxing Sky Voice Garment Company Ltd" (hereinafter "Jiaxing")

in China.   Wire records of an HSBC account under the name "USA
Design, Inc., DBA Apple Jeans," of which YAKOUB SAADIA is a co-
signer, indicate that, between June 2006 and October 2006,
approximately $460,000 has been wired from this account to
Jiaxing.   In turn, Jiaxing has shipped counterfeit goods to
SAADIA and others involved in the conspiracy.   For example, on or
about October 15, 2006, Jiaxing shipped container OOLU9043660,
indicating the consignee for the container as a company
associated with SAADIA, "Infinity Progress Marketing Ltd," as
noted above in paragraph 102.   The defendant HENRY MANDIL applied
for entry of the container.   The shipping documents for the
container listed the contents as womens' shoes, but the container
was intercepted and seized by Customs and found to contain
counterfeit Nike sneakers with a MSRP of approximately $900,000.

          123.   Another example of a container involved in the
smuggling scheme is container TRLU5613717, which was sent by
Jiaxing to "Infinity Progress Marketing Ltd.," and arrived at J &
J LA on or about October 27, 2006.   Entry for the container was
filed by the defendant HENRY MANDIL.

          HENRY MANDIL and RAMNARINE TIWARI, also known as "Chris"

          124.   The defendant HENRY MANDIL is the licensed customs
broker of the customs house brokerage "HJM International"
(hereinafter "HJM"), located at 153-39 Rockaway Boulevard in
Jamaica, New York.

125.   The defendant RAMNARINE TIWARI, also known as "Chris," was an employee of HJM.

126.   As noted above in paragraphs 113, 116 and 122 through 123, the defendant HENRY MANDIL assisted the defendant YAKOUB SAADIA in smuggling several containers of goods into the United States.   TIWARI assisted the defendant HENRY MANDIL in the smuggling.

127.   During an interview on or about December 11, 2006, an employee of HJM, the defendant RAMNARINE TIWARI admitted that, pursuant to the direction of the defendant HENRY MANDIL, employees of HJM moved containers of goods imported by the defendant YAKOUB SAADIA and his company, "United Textiles," prior to the containers being cleared by Customs.   He also stated that MANDIL and SAADIA presented Customs with "replacement freight," when Customs sought to examine a container that was already moved.   TIWARI stated that he knowingly assisted MANDIL and SAADIA present Customs with the "replacement freight" scheme.

128.   Employees of various container freight stations working with MANDIL indicated that they communicated with either MANDIL himself or TIWARI.   Additionally, several emails sent by TIWARI from his HJM account evidence his involvement in the scheme to defraud Customs.   For example, an email dated May 4, 2006, from TIWARI to employees of Metrobox, with the subject heading "FW: Delivery Order (BPW-0006332-8-5BR6700-OOLU-

01759090), states: "d/o for the container on the way to seajet,"
and contains an attachment of an order requesting the delivery of
container OOLU5380214 to Sea Jet.  Customs records reveal that
the container was not released by Customs as of May 4, 2006, when
TIWARI ordered the movement of the container from Metrobox to
SeaJet.

129.  On or about December 21, 2006, TIWARI agreed to
make a consensually monitored telephone call to MANDIL.  Upon
telling MANDIL that he didn't want to be involved in the
"replacement freight" scheme any longer and wanted to quit his
job, MANDIL pleaded with TIWARI to "wait until [he] comes back"
to the office and stated that TIWARI "d[id]n't have to do
anything [he] d[id]n't want to do."

130.  The defendant PHILLIP MCENTEE, an employee of
Metrobox, admitted to sending MANDIL's containers to SeaJet, the
non-Customs-bonded warehouse used by SAADIA, prior to the release
of the container by Customs.  Indeed, MANDIL applied for entry of
container YMLU6125210, which employees of Metrobox delivered to
SeaJet on or about August 24, 2006, prior to Customs release.
MANDIL also applied for entry of container HDMU6908527, which was
delivered to SeaJet on or about March 24, 2006, prior to Customs
release, as well as container 00LU7381164, which was delivered to
SeaJet on or about April 12, 2006, prior to Customs release.

131.  On or about March 28, 2007, agents interviewed the defendant HENRY MANDIL at the offices of HJM.  During the interview, MANDIL provided agents with emails and documents concerning containers agents suspected were involved in the smuggling scheme.  For example, MANDIL provided agents with an email from MANDIL to the defendant YAKOUB SAADIA referencing container MSCU8605571 that reads, "Container is being picked up by Railhead tomorrow and being delivered to Sea Jet tomorrow. Please make arrangements so that they take it and have cargo ready to go back to Railhead.  Please confirm.  Thanks.  Henry, HJM International Inc."  Information later received from Railhead Customs Exam Site indicates that MANDIL conspired with employees of Railhead to have the container picked up from the port by Railhead prior to Customs' release of the container and then delivered to SeaJet, and that Railhead was given "replacement freight" by SeaJet to take back to its facilities for examination by Customs.  Such information is described infra in paragraphs 142 through 144.

132.  Several containers MANDIL and SAADIA attempted to smuggle using the above schemes were seized by Customs.  Those include: TCNU9839043, which was found to contain counterfeit Babyphat clothing with a MSRP of approximately $1,358,422; AMFU8592893, which was found to contain counterfeit Rocawear jeans with a MSRP of approximately $1,762,160; HJCU9003600, which

was found to contain counterfeit Rocawear and Ecko clothing with
a MSRP of approximately $1,250,000; HJCU9041596, which was found
to contain counterfeit wearing apparel including Rocawear, Enyce,
and Phat Farm, with a MSRP in excess of $500,000; OOLU9005042,
which was found to contain counterfeit Nike sneakers with a MSRP
of approximately $937,500; OOLU9043660, which was found to
contain counterfeit Nike sneakers with a MSRP of approximately
$900,000; GATU7001986, which was found to contain counterfeit
Nike sneakers with a MSRP of approximately $408,000; GATU7001693,
which was found to contain counterfeit Timberland goods with a
MSRP of $436,740; MSKU4556668, which was found to contain
counterfeit Timberland goods with a MSRP of $511,000; and
HJCU4124487, which was found to contain counterfeit Rocawear
goods with a MSRP of $175,500.

PHILLIP MCENTEE

133.  The defendant PHILLIP MCENTEE is the owner
Metrobox Container Freight Station.  I interviewed MCENTEE on or
about May 4 and 5, 2006, and MCENTEE admitted to sending the
defendant HENRY MANDIL's containers to SeaJet prior to Customs'
release of the containers.  According to MCENTEE, per MANDIL's
instructions, he would file PTTs for the container and then
deliver the containers to SeaJet prior to Customs cleared the
containers to enter the United States.  MCENTEE provided

documents for approximately 11 containers smuggled per MANDIL's instructions.   Some of those containers are described below.

134.   On March 21, 2006, employees of Metrobox obtained a PTT for container HDMU6908527, authorizing the container to be moved from the port to Metrobox's facility.   The arrival notice for the container has a  handwritten header stating: "Attn: mira/phil, please file ptt."   Prior to the container being granted entry, however, Metrobox delivered the container to SeaJet on or about March 24, 2006.   Shipping documents for the container listed a shell company connected to SAADIA and United Textiles.   The documents listed the contents of the container as "comforters."   Entry for the container was not approved until March 30, 2006.

135.   On or about April 11, 2006, employees of Metrobox obtained a PTT for container 00LU7381164, authorizing the container to be moved from the port to Metrobox's facility. Prior to the container being granted entry, however, Metrobox delivered the container to SeaJet on or about April 12, 2006. The container was not released by Customs until June 1, 2006. Shipping documents for the container listed shell companies connected to SAADIA and United Textiles and indicate "Joe Qureshi" as the contact person, with telephone number (917) 250-0088 and fax number (215) 359-1535.   The documents listed the contents of the container as "comforters" and "ladies' skirts."

136.  On or about August 4, 2006, employees of Metrobox sought a PTT for container HJCU9020715.  The container was examined by Customs, was found to container counterfeit Babyphat, Marithe Francoise Girbaud, and Rocawear clothing, with a MSRP of approximately $1,357,200, and was seized.  Shipping documents for the container listed a shell company connected to SAADIA and United Textiles.

### JOSEPH VENETUCCI

137.  The defendant JOSEPH VENETUCCI is the owner of GTS, a Customs-bonded container freight station, located at 100 Newfield Avenue in Edison, New Jersey.

138.  As noted above, agents learned that SAADIA has smuggled containers into the United States using GTS.  I interviewed VENETUCCI on or about February 8, 2006.  During the interview, VENETUCCI admitted that, pursuant to the request of the defendant HENRY MANDIL, he assisted in moving containers from his bonded freight station to non-bonded locations prior to their release by Customs.  VENETUCCI stated that "Chris" from HJM told him that Customs issued provisional releases for all HJM shipments because of the number of containers HJM imports.[13]

---

[13]Customs does not issue, and has never issued provisional releases to any entities.  All containers must be formally cleared prior to entry into the commerce of the United States. As the owner of a Customs-bonded container freight station, VENETUCCI has been made aware by Customs of the Custom rules and regulations that apply to the movement of containers.  See also fn.2.

VENETUCCI provided me with a spreadsheet listing 43 containers for which MANDIL asked him to file a PTT. VENETUCCI was asked about a container for which GTS filed a PTT, container HJCU9023720. He stated that the container was delivered to SeaJet on August 18, 2006. Customs records indicate that the container was not released by Customs until August 19, 2006.

139. Another container for which a PTT was filed by GTS, container AMFU8592893, was manifested to contain jackets and skirts, but was seized and found to contain counterfeit Rocawear and counterfeit Babyphat jeans with a MSRP of approximately $1,762,160. VENETUCCI stated that GTS never picked up the container because the job was canceled by "Chris" at HJM (following the container's seizure by Customs). An email from GTS's file on this container contained an email dated November 10, 2006, from GTS to "Chris" at HJM stating: "Hi Chris, Per our conversation we are closing the following jobs: AMFU 859 289 3...." An email dated November 17, 2006, from "Chris" at HJM states, "Confirmed closed."

140. Information provided by CW2, and email communications between the defendant YAKOUB SAADIA and CW2, indicate that SAADIA directed CW2 to send "replacement freight" that was stored at CW2's warehouse to the GTS warehouse, so that it could be used as "replacement freight" for containers Customs sought to examine based on GTS PTTs. For example, on or about

July 20, 2006, employees of GTS filed a PTT for container HJCU1070216.  The container contained two shipments, one of which was selected for Customs examination on or about July 27, 2006. That shipment was manifested as 287 cartons of comforters.  On or about August 16, 2006, SAADIA emailed CW2 and asked him to send 287 "clean" cartons of comforters to GTS.  Attached to the email was a delivery order requesting delivery of the 287 cartons to GTS.

141.  As another example, on or about August 15, 2006, employees of GTS filed a PTT for container HJCU9053637.  The container contained two shipments, one of which was selected for Customs examination on or about August 22, 2006.  That shipment was manifested as 130 cartons of "PVC jackets."  On or about September 14, 2006, SAADIA wrote to CW2 indicating that 191 cartons of caps and 130 cartons of jackets should be delivered that day to GTS.  SAADIA asked CW2 to "pull out clean boxes" of the foregoing, which, according to CW2, meant boxes that did not already have markings indicating they had previously  been examined by Customs.

JUDY FRISCO and JAMES BALL

142.  The defendant JUDY FRISCO is a former Container Exams Site Manager at the Railhead Customs Exam Site and has been employed at Railhead for fifteen years.  The defendant JAMES BALL is a former Operations Manager at the Railhead Customs Exam Site.

As managers of a Customs Exam Site, FRISCO and BALL have been made aware by Customs of the Custom rules and regulations that apply to the movement of containers. See also fn.3.

143. As noted above in paragraph 131, MANDIL conspired with JUDY FRISCO and JAMES BALL, employees of Railhead Customs Exam Site, to have containers picked up from the port by Railhead prior to their release by Customs and then delivered to SeaJet, at which time Railhead was given "replacement freight" to take back to its facilities for examination by Customs. An example of a container so smuggled is KKFU9117043. An email dated December 15, 2006, from MANDIL to employees of Railhead, the defendants JUDY FRISCO and JIMMY BALL, states: "Hi Jimmy/Judy, This container was not delivered today. Can you please look into it. This is urgent. Please advise. Thanks." Another email, dated December 18, 2006, reads: "The container was not delivered. Please keep your word. I am on vacation. I want to rest." An email dated December 19, 2006 from BALL to MANDIL states: "The driver left the pier at 7:30 on Friday night and the container was delivered on Monday morning." Documents contained within the Railhead file for the container indicate that the container was picked up by a Railhead driver from the port and delivered to Railhead on or about December 15, 2006, that a Railhead driver delivered the container to SeaJet on or about December 18, 2006, and that a Railhead driver returned to SeaJet on or about

December 19, 2006 and obtained one hundred cartons which were then brought to Railhead CES for exam. As noted above, SeaJet is not a Customs-bonded facility and therefore, BALL should not have had the container delivered there prior to Customs release.

144. Another example of a container smuggled by MANDIL with the assistance of FRISCO is container FSCU7055149. On or about November 11, 2006, MANDIL wrote an email to FRISCO stating: "Hi Judy, I am faxing you today dad[14]/ for 186 carton under exam and 279 that is Customs cleared. I only want Customs to see the [sic] 186 carton since they cleared the 279. Can we do like last time. Driver picks up the freight from the terminal and delivers the cntr [sic] to Sea Jet and they will unload the 279 and keep the 186 for you. Please confirm. We have guaranteed the demurrage until tomorrow. Henry." A return email from FRISCO to MANDIL states: "Jim [BALL] said we can do this. I need a delivery order and in Maher Terminal system it is stating intensive exam required, not transfer to CES." Per Customs rules and regulations, a container may not be moved from the port if any shipments within that container are under examination. Accordingly, FRISCO unlawfully agreed to move the shipment from the port to SeaJet. Again, as an employee of a Customs Exam

---

[14]/"DAD" stands for "Delivery Authorized Document," which is a document issued by Customs that authorizes the shipment for the particular container listed on the document moved from the port to a container freight station or from a container freight station to a Customs Exam Site.

Site, FRISCO has been made aware of such rules and regulations. A supervisor of FRISCO has stated that FRISCO is aware of the rules and regulations governing the movement of containers.

145. Documents obtained from Railhead also reveal that BALL was involved in the smuggling of container KKFU9071404. A delivery order for the container shows that the container was picked up from Maher Terminal by a Railhead driver and delivered to Railhead on or about January 11, 2007. A delivery receipt for the container indicates that the full container was delivered to SeaJet on or about January 16, 2007 by a Railhead driver. As noted above, SeaJet is not a Customs-bonded facility and therefore, the container should not have been sent there by Railhead prior to Customs release. The direction to the dispatcher to deliver the container to SeaJet was given to the dispatcher by BALL. Another document in the file for this container shows that the container was delivered back to Railhead on or about January 24, 2007. Upon information and belief, the container that was delivered back to Railhead was not the original container, but "replacement freight."

JOHN HSU

146. The defendant JOHN HSU is the manager of J & J International Transport located at 901 W. Hillcrest Boulevard in Inglewood, California ("J & J LA").

147.  CW2 informed agents that HSU has assisted SAADIA
in smuggling containers into the United States at Port of Long
Beach in California.  In a consensually monitored call between
CW2 and HSU, HSU admits to his involvement in the scheme.  When
asked by CW2 if he was still doing business with United Textiles,
HSU replied, "Just a little.  Not that much anymore."  When asked
if he kept replacement freight at his warehouse for freight that
was delivered before Customs had a chance to examine the
containers, HSU replied in the affirmative.  During the
conversation, HSU also denied knowing that SAADIA was smuggling
counterfeit goods, but stated that SAADIA tried to "lower his
duty. ... [E]verything is legal except the duty, he tries to
avoid that." HSU stated he "does," i.e., smuggles, three to five
containers per week for United Textiles.

148.  CW2 provided agents with a spreadsheet he received
from J & J LA, which contains information about 17 ocean
containers handled by J & J LA on behalf of United Textiles
between June 20, 2006 and July 28, 2006.

149.  On December 15, 2006, ICE agents in Los Angeles
conducted a covert examination of a shipment for which J & J LA
had filed a PTT, container EISU8027040.  The shipping documents
for the container listed the goods as ladies footwear, but the
container was found to contain counterfeit Timberland workboots.
The shipping documents also listed a shell company of SAADIA's as

the consignee of the container.  An application for entry of the container was filed by the defendant HENRY MANDIL.  The agents retained samples and photographs of the container.  Customs placed a hold on the container and a formal examination was conducted.  The shipment presented for identification was replacement freight, namely, women's shoes.

FARAJ SADAKA, also known as "Freddy"

150.  CW2 has informed agents that the defendant FARAJ SADAKA, also known as "Freddy," has assisted him and the defendant YAKOUB SAADIA in organizing the "replacement freight" that would be presented to Customs for shipments that had been moved by SAADIA and the co-conspirators before they were released by Customs.  Specifically, according to CW2, SADAKA came to CW2's warehouse to "clean up" replacement freight that was showing signs of wear and tear from having been presented to Customs on many occasions.  An email from SAADIA, dated August 23, 3006, referencing an upcoming Customs examination of replacement freight held at CW2's warehouse, states: "Just make sure all clean, Freddy will stop today just to help."

151.  On or about September 13, 2006, agents monitored a meeting between CW2 and SADAKA during which SADAKA made incriminating statements concerning his role in the replacement freight scheme.  The meeting was recorded on audio and video. During the meeting, when CW2 expressed concern about the

replacement freight boxes being marked by Customs or were old and dusty, SADAKA told CW2 that he would "send a truck" to take away any boxes that were marked by Customs or contained Customs black tape on the boxes. He also stated that he would replace old cartons with new cartons and that he and SAADIA could arrange for two individuals to come into CW2's warehouse to "organize the freight."

### MONIQUE ROLON

152. The defendant MONIQUE ROLON, also known as "Monique Communale," is the owner of "M. Rolon, Limited," a "logistics" and trucking company, located at 192 Highlawn Avenue in Brooklyn, New York.

153. During the investigation, agents learned that the defendant MONIQUE ROLON assisted the defendant YAKOUB SAADIA in smuggling containers of counterfeit goods using a "diversion scheme." The scheme involved the co-conspirators filing an application with Customs for a "transport and export" bond, also known as a "T & E bond." The T & E bond would authorize the containers to enter the United States only for the purpose of crossing the United States on the way to Canada. The paperwork filed by the co-conspirators indicated that the container were going to arrive in various seaports, including, but not limited to Port Newark, the New York Container Terminal in Staten Island, New York, and Port of Long Beach in California, and be escorted

using Customs-bonded vehicles and facilities through the United States all the way to the containers' actual destination in Canada. The containers involved in the instant scheme, however, were not escorted through the United States to Canada. Instead, ROLON arranged for the containers to be delivered from the ports to SAADIA or his customers within the United States.

154. Agents first learned of ROLON's involvement in the scheme through CW2. CW2 informed agents that he/she received a delivery order from SAADIA for a container SAADIA wanted CW2 to help him smuggle into the United States. CW2 did not receive the accompanying shipping documents. On or about August 10, 2006, CW2 emailed SAADIA about the container, who informed him to "ignore" the delivery order. Agents then conducted an investigation of the container, EISU8022310, and learned that on or about August 9, 2006, a "T & E" bond was approved for this container. Customs records list "United Textile Import" as the consignee for the container. The shipment was manifested as PVC sneakers and arrived at Port Newark on or about August 12, 2006 from China. Agents also learned that the container was picked up by a Customs-bonded warehouse on or about August 15, 2006.

155. I subsequently interviewed the owners of the Customs-bonded warehouse that picked up that container. When asked about container EISU8022310, they stated their customer for that container was MONIQUE ROLON. They stated that ROLON had

been a customer for the past four to five months and they had
assisted her in moving approximately 150 containers, for which
she paid them $375 per container.  The owners also stated that
their company would receive information about a particular
container from the customs broker who filed the application for
the T & E bond, known as "New Direx", and then would pick up the
containers from Port Newark and, pursuant to ROLON's directions,
deliver the containers to a storage facility called "Secure
Parking," located at 635 Delancey Street in Newark, New Jersey.
The owners of the Customs-bonded warehouse also stated that some
of the containers were stored at their warehouse and ROLON would
send someone to pick up those containers.  The owners provided me
with a list of container numbers corresponding to the containers
moved for ROLON.  Customs records reveal that the containers on
the list were brought into the United States by T & E bonds for
delivery to Canada.  The T & E bonds for the containers indicated
that the Customs-bonded trucking companies authorized to pick up
the containers were "McGill Trucking" and "Mobile Air Transport."
The owners of the Customs-bonded warehouse who picked up the
containers admitted that their Customs bond was not authorized to
move the containers by a T & E bond.  The arrival notices and
other shipping documents filed in support of the applications for
the T & E bonds for several of the containers listed companies
that are connected to the defendant YAKOUB SAADIA.

156.   On or about and between September 5, 2006 and October 4, 2006, several containers believed to be involved in the scheme were placed on hold by Customs and ultimately seized. The arrival notices and other shipping documents in support of the T & E bonds for these containers referenced contact information for the defendant YAKOUB SAADIA.   The held containers included approximately 10 containers, some of which were listed as containing cotton "caps," woven "vests," and "stuffed toys," but all of which contained counterfeit Nike sneakers.

157.   On September 6, 2006, one of the owners of the Customs-bonded warehouse referred to in paragraph 154, agreed to place a consensually monitored call to ROLON.   During the call, the owner asked ROLON if she was "still having problems with ... the exams and stuff," to which ROLON replied, "Yeah.  Let me tell you what happen.  They yanked twelve of my containers."   She mentioned that the containers would be moving to "an exam site" and then noted, "[b]ut I got fifty more containers coming in."   During the conversation ROLON also made reference to her "client" being in Puerto Rico.   Travel records for SAADIA indicate that he was in Puerto Rico on or about that time.

158.   On or about June 1, 2007, I interviewed ROLON about the shipments that were seized in or about August 2006. ROLON admitted that she had assisted in delivering the containers to locations within the United States, as her client requested.

ROLON stated that her client gave her the addresses in Canada to list on the T & E bonds, but admitted that she did not deliver any shipments to Canada. She also admitted that she did not work with McGill Trucking or Mobile Air Transport, the Customs-bonded entities listed on the T & E bonds as being authorized to move the shipments.

C.   Probable Cause to Search SUBJECT PREMISES 1

159. As discussed above, there is extensive evidence that the defendants KWOK KEUNG WONG and KIM CHI WONG are engaged in a conspiracy to smuggle shipments of goods into the United States and that they conduct business using their company, Air Trans Logistics (USA) ("ATL"), out of SUBJECT PREMISES 1.

160. THE PREMISES KNOWN AND DESCRIBED AS 230-59 INTERNATIONAL AIRPORT CENTER, NORTH LOWER SUITE 190, AIR TRANS LOGISTICS, SPRINGFIELD GARDENS, NEW YORK ("SUBJECT PREMISES 1"), is an office located within a two story building containing warehouse and office space. The building is located within an office complex near Rockaway Boulevard in Queens, New York. There are two entrances located on the East side of the building. The numbers "230-59" appear over each of these entrances. There are signs above each of the two entrances which read "North Lobby Entrance" and "South Lobby Entrance." Upon entering the door marked "North Lobby Entrance 230-59," at the far end of a lobby is a door marked "Air Trans Logistics." On or about June 20,

2007, a law enforcement agent visited SUBJECT PREMISES 1 and confirmed that ATL is currently located there.

161. Based on my experience, training and discussions with other agents investigating crimes such as commercial fraud, smuggling, and trafficking in counterfeit goods, persons who smuggle goods into the United States typically maintain records used in furtherance of the smuggling schemes at the sites used to effectuate the schemes. The type of evidence that is typically found at such locations, and the type of evidence that I anticipate seizing, includes, but is not limited to: (1) Business records such as telexes, debit notes, checks, memos, general ledgers and subsidiary ledgers, invoices, purchase orders, bills of lading, and carrier records; (2) correspondence, including mail faxes, and emails; (3) bank records, financial records, letters of credit, and consumption entry forms; (4) importation records, including all documents sent to the United States Custom and Border Protection, as well as supporting documentation, including but not limited to, packing slips, purchase orders, contracts, and importation log books; and (5) computers and computer records, facilities, and storage media together with the contents thereof.

162. In addition, based on my training and experience, I know that in most cases it is impossible to successfully conduct a complete, accurate, and reliable search for electronic

evidence stored on a computer or other electronic storage media during the physical search of a search site.  This is true for a number of reasons, including but not limited to the following:

a.   Technical Requirements:  Searching computers and other electronic storage media for criminal evidence is a highly technical process requiring specific expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in particular systems and applications, so it is difficult to know before a search which expert is qualified to analyze the particular system(s) and electronic evidence found at a search site.  As a result, it is impossible to bring to the search site all of the necessary personnel, technical manuals, and specialized equipment to conduct a thorough search of every possible computer system.  In addition, electronic evidence search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code embedded in the system such as a "booby trap"), a controlled environment is essential to ensure its complete and accurate analysis.

b.      Volume of Evidence:  The volume of data stored on many computers and other electronic storage media is typically so large that it is impossible to search for criminal evidence in a reasonable period of time during the execution of the physical search of a search site.  A single megabyte of storage space is the equivalent of 500 double spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double spaced pages of text.  Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers.  Consequently, each non networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which, if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

c.      Hidden or Obfuscated Evidence.  Computer users can conceal data within computers and electronic storage media through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text.  Similarly, computer users can encode communications to avoid using key words that would be consistent with the criminal activity.  Computer users can also attempt to conceal electronic evidence by using encryption technologies.  For example, some encryption systems

88

require that a password or device, such as a "dongle" or "keycard," be used to obtain a readable form of the data. In addition, computer users can conceal electronic evidence within another seemingly unrelated and innocuous file using a process known as "steganography." For example, by using steganography, a computer user can conceal text in an image file in such a way that it cannot be read when the image file is opened using ordinary means. As a result, law enforcement personnel may have to search all the stored data to determine which particular files contain items that may be seized pursuant to the warrant. This sorting process can take a substantial amount of time, depending on the volume of data stored and other factors.

d.      Deleted or Downloaded Files. Computers and other electronic storage media allow suspects to delete files to attempt to evade detection or to take other steps designed to frustrate law enforcement searches for information. However, searching authorities can recover computer files or remnants of such files months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. When a person "deletes" a file on a home computer, the data contained in the file do not actually disappear; rather, the data remain on the hard drive until they are overwritten by new data. As a result, deleted files, or remnants of deleted files, may reside in free or "slack" space (i.e., in space on the hard drive that

is not allocated to an active file or that is unused after a file
has been allocated to a set block of storage space) for long
periods of time before they are overwritten.  A computer's
operating system may also keep a record of deleted data in a
"swap" or "recovery" file.  Similarly, files that have been
viewed via the Internet are automatically downloaded into a
temporary Internet directory or "cache."  The browser typically
maintains a fixed amount of hard drive space devoted to these
files, and the files are only overwritten as they are replaced
with more recently viewed Internet pages.  Thus, the ability to
retrieve the residue of an electronic file from a hard drive
depends less on when the file was downloaded or viewed than on a
particular user's operating system, storage capacity, and
computer habits.

    e.  Search Techniques.  Because of the above described
technical requirements, volume of evidence, and the ability of
suspects to delete, download, hide and/or obfuscate evidence, the
analysis of electronically stored data may entail any or all of
several different computer forensics techniques.  Such techniques
may include, but are not limited to, surveying various file
"directories" and the individual files they contain (analogous to
looking at the outside of a file cabinet for the pertinent files
in order to locate the evidence and instrumentalities authorized
for seizure by the warrant); "opening" or reading the first few

"pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

In accordance with the information in this affidavit, law enforcement personnel will execute the search of computers systems seized pursuant to this warrant as follows:

a.    Upon securing the search site, law enforcement personnel trained in searching and seizing computer systems (hereinafter "computer personnel") will conduct an initial review of any computer systems to determine whether the data contained on these systems can be duplicated on site in a reasonable amount of time and without jeopardizing the ability to accurately preserve the data.

b.    If based on their training and experience, and the resources available to them at the search site, the computer personnel determine it is not practical to make an on site copy of the data within a reasonable amount of time and without jeopardizing the ability to accurately preserve the data, then the computer systems will be seized and transported to an

91

appropriate law enforcement laboratory for review.  The computer systems will be reviewed by appropriately trained personnel to extract and seize any data that falls within the list of items to be seized pursuant to the warrant.

c.    In order to search fully for the items identified in the warrant, the computer personnel may examine all of the data contained in the computer systems to view their precise contents and determine whether the data fall within the list of items to be seized pursuant to the warrant.  In addition, the computer personnel may search for and attempt to recover deleted, hidden, or encrypted data to determine whether the data fall within the list of items to be seized pursuant to the warrant.

If searching authorities determine that none of the data contained on a computer system fall within any of the items to be seized pursuant to the warrant, law enforcement personnel will return the computer system within a reasonable period of time, unless further authorization is obtained from the Court.

In order to search for data that fall within the list of items to be seized pursuant to the warrant, law enforcement personnel will seize and search the following items (heretofore and hereinafter referred to as "computer systems"), subject to the procedures set forth above:

a.     Any computer equipment and storage device capable of being used to commit, further, or store evidence of the offense listed above;

b.     Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners;

c.     Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD R, CD RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

d.     Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices or software;

e.     Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

f.     Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

g.   Any passwords, password files, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

163.  Based upon the foregoing, I believe that there is probable cause to believe that the items set forth above, all of which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 545, will be found at Subject Premises #1.  These items would constitute evidence of and means of committing the criminal offenses referred to above, and would be instrumentalities in the violations recited herein.

D.   Probable Cause to Search SUBJECT PREMISES 2

164.  As discussed above, there is extensive evidence that the defendants RONALD and JOSEPH DEPAOLA are engaged in a conspiracy to smuggle shipments of goods into the United States and that they conduct business using their company, Jetex Trucking, out of SUBJECT PREMISES 2.  Additionally, CW1 has informed agents that the DEPAOLAs keep their shipping documents relating to the smuggling scheme in their office, SUBJECT PREMISES 2.  On June 20, 2007, CW1 confirmed that the DEPAOLAs currently conduct business out of SUBJECT PREMISES 2.

165.  THE PREMISES KNOWN AND DESCRIBED AS 230-59 INTERNATIONAL AIRPORT CENTER, FIRST FLOOR, OFFICE OCCUPIED BY RONALD AND JOSEPH DEPAOLA, SPRINGFIELD GARDENS, NEW YORK

("SUBJECT PREMISES 2") is an office located within a two story building containing warehouse and office space. The building is located within an office complex near Rockaway Boulevard in Queens, New York. The entrance to the SUBJECT PREMISES 2 is located on the West side of the building at the Northern corner of the building. The entrance is the furthest door from Rockaway Boulevard on the West side of the building. The pedestrian entrance is located adjacent to a truck bay marked "#1." The door is not marked from the outside, but inside of the door reads "Ultimate Express." The SUBJECT PREMISES 2 is located directly in front of the entrance through a second unmarked door. The SUBJECT PREMISES 2 consists of a common area and two smaller offices.

166. Based on my experience, training and discussions with other agents investigating crimes such as commercial fraud, smuggling, and trafficking in counterfeit goods, persons who smuggle goods into the United States typically maintain records used in furtherance of the smuggling schemes at the sites used to effectuate the schemes. The type of evidence that is typically found at such locations, and the type of evidence that I anticipate seizing, includes, but is not limited to: (1) Business records such as telexes, debit notes, checks, memos, general ledgers and subsidiary ledgers, invoices, purchase orders, bills of lading, and carrier records; (2) correspondence, including

mail faxes, and emails; (3) bank records, financial records, letters of credit, and consumption entry forms; and (4) importation records, including all documents sent to the United States Custom and Border Protection, as well as supporting documentation, including but not limited to, packing slips, purchase orders, contracts, and importation log books.

167.  Based upon the foregoing, I believe that there is probable cause to believe that the items set forth above, all of which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 545, will be found at Subject Premises #2.  These items would constitute evidence of and means of committing the criminal offenses referred to above, and would be instrumentalities in the violations recited herein.

### III.  CONCLUSION

168.  For the reasons set forth above, the government submits that there is probable cause to arrest the defendants and probable cause to search SUBJECT PREMISES 1 and SUBJECT PREMISES 2.

WHEREFORE your deponent respectfully requests that arrest warrants be issued for KWOK KEUNG WONG, also known as "Bill Wong," YIM CHI WONG, also known as "Jean Wong," SCHLOMO GREENBERG, JOHN SCIARA, RONALD DEPAOLA, also known as "Ronald DePaula" and "Ronald DePaolo," JOSEPH DEPAOLA, also known as

"Joseph DePaula" and "Joseph DePaolo," CHRISTINE DEJOHN, ROBERT ROSSOMANGO, YAKOUB SAADIA, also known as "Joe," "Joe Qureshi" and "Jack Saadia," HENRY MANDIL, RAMNARINE TIWARI, also known as "Chris," PHILLIP MCENTEE, JOSEPH VENETUCCI, JUDY FRISCO, JAMES BALL, JOHN HSU, FARAJ SADAKA, also known as "Freddy," and MONIQUE ROLON, also known as "Monique Communale," so that they may be dealt with according to law.

FURTHER, your deponent respectfully requests that search warrants issue for SUBJECT PREMISES 1 and SUBJECT PREMISES 2.

FURTHER, your deponent requests that the Court order that this Affidavit, as well as any arrest warrants issued pursuant to this Affidavit, be sealed, until further order of the Court.

ROBERT WILLIAMS
Special Agent, ICE

Sworn to before me on
___ day of June, 2007

# INDEX TO AFFIDAVIT AND COMPLAINT

I.   BACKGROUND,                              7-10
     A. The Importation of Goods into the United States

II.  THE DEFENDANTS                          10-13

III. THE CURRENT INVESTIGATION,              13-87
     A.   The Schemes                        13-18
     B.   The Offense Conduct                18-83
          Kwok Keung Wong                    19-24
          Yim Chi Wong                       19-24
          Schlomo Greenberg                  24-39
          John Sciara                        24-39
          Ronald DePaola                     39-44
          Joseph DePaola                     39-44
          Christine DeJohn                   44-50
          Robert Rossomango                  50-55
          Yakoub Saadia                      55-66
          Henry Mandil                       66-70
          Ramnarine Tiwari                   66-70
          Phillip McEntee                    70-72
          Joseph Venetucci                   72-75
          Judy Frisco                        74-77
          James Ball                         74-77
          John Hsu                           77-79
          Faraj Sadaka                       79-80
          Monique Rolon                      80-84
     C.   Probable Cause to Search
          Subject Premises 1                 84-92
     D.   Probable Cause to Search
          Subject Premises 2                 93-95

IV.  CONCLUSION                              95-96